[Crim. No. 1868. Second Appellate District, Division Two.—December 17, 1930.]

THE PEOPLE, Respondent, v. NAT CORDISH, Appellant.

M. G. Phillips, W. J. Clark and Clare Woolwine for Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, Buron Fitts, District Attorney, and A. H. Van Cott, Deputy District Attorney, for Respondent.

490

CRAIG, J.—An indictment consisting of several counts was returned by the grand jury of Los Angeles County, charging the appellant and one E. K. Fleming with having forged certain contracts, and with having falsely and fraudulently taken moneys of certain named corporations. All counts were dismissed except one charging forgery and one charging grand theft. Fleming was acquitted of both offenses, and the appellant was found guilty of the crime of grand theft, and acquitted upon the other count. He appeals from the judgment and from an order denying a motion for new trial.

■ The first and principal point advanced is that the two offenses were so interrelated, though inconsistent, that an acquittal of one rendered legally impossible a conviction of the other. Specifically, the defendants were alleged in one count to have (1) forged the name of one William G. Schwindt to a purported contract for the purchase by Schwindt of an automobile from Mutual Motors, Incorporated, and (2) to have sold the worthless contract to the State Credit Corporation, for a valuable consideration, "well knowing the same was false, forged and counterfeited", and "with intent then and there to cheat and defraud the said State Credit Corporation, a corporation, William G. Schwindt, and others". "The next count charged that the defendants did "steal, take and carry away" certain moneys of the personal property of the State Credit Corporation.

According to the evidence adduced, appellant was president both of the Mutual Motors, Inc., which dealt in automobiles, and of a real estate sales concern known as Mutual City, which were maintained in the same office and were in need of funds. The appellant employed one Arthur Green as a realty salesman, following a conversation wherein appellant stated that Mutual Motors might furnish a number of automobiles to Mutual City, in the names of financially responsible persons as ostensible purchasers, by obtaining their permission so to do. Appellant executed in blank several conditional sales contracts as president of Mutual Motors, in which Green thereafter inserted descriptive data relating to various automobiles, which contracts were negotiated by appellant's agents with finance companies as genuine securities .or evidences of *bona fide* purchases of

automobiles and agreements to pay cash therefor. In one such instance, which resulted in the present charges, Green explained to said Schwindt, the realty company's need of machines, and requested permission to so use his name. The latter testified: "I told him that if there wouldn't be any liability to me, and it would be a favor to him, I would allow him to place one car in my name. . . . I would agree to it if I didn't have any liability in connection with it." He did not testify that he authorized a sale in his name, or that he purchased an automobile, or sanctioned or knew of the issuance of a contract in his name, or that he ever consented to the signature of his name by Green. Thereafter Green inserted the description of an automobile, and signed the name "William G. Schwindt" as vendee, in one of the blank contracts previously executed in the name of Mutual Motors by appellant, as vendor, also filling in recitals of a cash payment of $840, and twelve monthly installments of $112.67, each falsely appearing to be due from Schwindt. Without Schwindt's knowledge or consent Green opened an account in a bank in the former's name, upon which a check was drawn in favor of the State Credit Corporation for the first payment, thus giving the transaction a semblance of validity. The check was dishonored by the bank and returned unpaid. Appellant executed an assignment of said contract to the last-mentioned company, wherein it was recited, in part: "For the purpose of inducing the assignee to purchase the within contract, the undersigned makes the following representations: (1) That the said contract is a *bona fide* one, and is actually signed by the person named therein . . . and that said property has been delivered into the possession of the party of the second part." It is not attempted to be asserted that Schwindt received the car. Upon representations and under the belief that this document was genuine, the credit company purchased the same and paid to appellant's motor company the moneys mentioned in the indictment, or the sum of $1928.06. It resulted that one of appellant's salesmen for the realty company was furnished an automobile belonging to the motor company upon which a fictitious and valueless contract had been sold to State Credit Corporation for moneys with which appellant's two enterprises were financed. Concisely stated, one of appellant's salesmen

drove appellant's car, under the name of a third person who with the understanding that there should be no liability had agreed to a transaction without real parties nor the transfer of any property, and upon which the credit company paid nearly $2,000 for appellant's use and benefit. The jury found, in effect, by its verdict upon the forgery count that appellant did not sign nor cause the name of Schwindt to be signed without the latter's consent or knowledge. They did not find that he had forged the contract, and that knowing the same to have been forged that he did "utter, publish and pass the said contract for the payment of money . . . with intent then and there to cheat and defraud"; but they found that he stole, took and carried away certain moneys of the State Credit Corporation. The theory upon which the trial was conducted was that said moneys were obtained by false and fraudulent representations, through the uttering and use by appellant's agent or agents of such worthless contract.

It is here insisted that while the People were not required to specify in the indictment the means by which the crime of grand theft was committed, they elected to and did proceed at the trial upon the theory that it was committed by the uttering of a forged and false instrument, and that they are precluded by the doctrine of estoppel to urge an affirmance upon the ground that it was committed by false and fraudulent pretenses. The argument advances but a visionary distinction without a difference. Although the jury might not have believed that appellant authorized and directed the physical signing of the name of a particular person, it lay within their province to determine whether upon all of the evidence before them the defendant knowingly obtained moneys upon false evidences of indebtedness, which were forged and uttered by his agent. The jury were at liberty to conclude, as we must assume they did, that the proof of having obtained moneys by means of the authorized and intended false pretenses as to the value of a given document was sufficient, though it did not exclude every hypothesis upon which innocence of the actual forgery and uttering might be based.

Upon the same premise it is argued that the offense of uttering a false instrument "is exactly the same offense as that of obtaining money . . . by false representations as

contained in the contract'', and that an acquittal upon the first count is legally irreconcilable with a verdict of guilty upon the second. The separate charges were based upon different sections of the Penal Code. Section 470 provides: ''Every person who, with intent to defraud, signs the name of another person . . . knowing that he has no authority so to do, . . . or falsely makes, alters, forges . . . any contract; or utters, publishes, passes, or attempts to pass, as true and genuine, any of the above named false . . . matters, is guilty of forgery.'' Section 532 provides that: ''Every person who knowingly and designedly, by false or fraudulent representation or pretense, defrauds any other person of money, . . . is punishable in the same manner and to the same extent as for larceny of the money. . . . '' It is apparent merely from reading them that one who forges, utters and passes a false instrument may be convicted under section 470, whether or not he obtains money by such criminal acts; while one who by the use of a false document obtains money from another, knowing it to be false, need not have forged the same in order to have committed the offense denounced by section 532, and that the elements of the two offenses are not identical. An indictment may charge two or more different offenses connected together in their commission, of different statements of the same offense,'' in separate counts. (Pen. Code, sec. 954.) The defendant having been acquitted upon one count of an indictment containing alternative counts, it does not follow that the jury found all of the elements essential to the statement of that offense absent, but merely that they found absent elements distinguishing it from the offense alleged in the other count. This is the true test. (*People* v. *Day*, 199 Cal. 78 [248 Pac. 250].)

A brief statement of appellant's contention that notwithstanding the contract was not signed by the party of the second part, if another was authorized to sign it for him, the act of Green was the act of Schwindt and the purchaser of the contract ''obtained just what it expected to obtain'', requires but slight consideration in view of the facts presented. There is no indication that anyone other than appellant and his agent was cognizant of the true status of the transaction or was afforded any patent ground for distrust. A *bona fide* contract evidencing a valuable con-

sideration, actually signed by the party named therein, who receives the specified property, is not akin to nor affected by an unauthorized signature to a fictitious evidence of liability upon which neither property nor consideration passes. The credit company was induced to accept and to pay cash for a purported security which the party therein named had not seen and of which he had no knowledge. It would be indeed a novel and fallacious theory by which such attempt to signify an obligation of Schwindt could be deemed a validation of the fraud depriving the purchaser of recourse, to the end that it might recover from him the cost of an automobile which appellant had simply changed from one hand to the other. There is no evidence tending to show that Schwindt ever learned that permission to place a car "in his name" had created a liability, nor that the credit company at any time relied upon any guaranty other than representations of appellant's agents as to the validity of the contract.

It is further suggested that the jury may have been confused by conflicting presumptions; that since the evidence tended to show a custom of appellant to leave with agents contracts and assignments thereof, signed in blank, to be filled out "without his knowledge" when absent from the office, they may have inferred without warrant that these details were carelessly or surreptitiously performed by the agents. It is asserted that proof of execution of the documents in blank, coupled with the presumption that the ordinary course of business was followed and that appellant knew the nature of the transactions, should not be allowed to prevail over the stronger presumption of innocence. We are neither justified by the record nor inclined to assume that the jury did so presume and that they ignored other inferences of guilt which could well have been drawn. Fine distinctions in the probative effect of presumptions may not in the face of ample instructions be assumed to have distracted the attention of the jury in their consideration of issues so important to the People and to the defendant. There is no room for apprehension that the verdict may have been influenced by the presumption of innocence being confronted with the presumption that the private transactions were fair and regular, since we think the evidence tended fully to controvert both presumptions.

■ During cross-examination of a witness who had acted as secretary of the credit company, who did not negotiate with Cordish, and whose duties with respect to contract after their purchase were clerical and subordinate, he was asked certain questions to which objections were sustained. Typical of these was the question as to whether or not the identity of the contracting purchaser was material to the company, so long as an automobile in fact did exist as security, and the motor company as vendor had guaranteed the contract. The purpose of such inquiry was to elicit whether or not the State Credit Corporation relied upon the alleged false representations. It appeared that the witness was not in an executive capacity to dictate or control the policies or business activities of the company, and was not invested with discretion as to the acceptance or rejection of securities. Any answer which he could have given would have been hearsay, and a conclusion. Other questions as to conversations during directors' meetings, also to ascertain the reason for purchasing contracts, were objected to upon the ground that the witness was not qualified to state upon whom the purchasing company relied, and that his reply would be hearsay. It is insisted that if he had been permitted to swear that contracts were purchased and paid for, regardless of their intrinsic value, no offense could have been chargeable to appellant. There was no showing that the credit company's manager who did conduct the negotiations, but was not present at the trial, conspired with Cordish or his agent to finance the realty or motor sales business upon fictitious securities, nor that such a scheme was suspected by the credit company. We think objections to an attempt to compel this witness to so testify were properly sustained. ■ The argument that he was the only representative of the company available, and that he had produced and identified its record, is not persuasive as to the competency of his testimony, with respect to matters beyond his own clerical sphere of employment and observation.

■ Contentions that error was committed in allowing the district attorney to impeach a witness called by the People, that he was guilty of misconduct in so doing, and that the court erred in stating to the jury that the impeachment should be considered as evidence against the defend-

ant, without instructing them to the contrary, are fallacious. The witness Green, who had previously made a statement that he obtained and acted upon the authority of Cordish in negotiating seven false and fictitious documents, suffered a lapse of memory and became adverse toward the prosecution while on the stand. Pressed for answers, his memory was refreshed by said statement, over objections by the defense, and finally he admitted that he had given prior inconsistent answers to material questions. We are unable to find in the record any statement to the jury by the court that the impeachment should be viewed as evidence. The defendant's counsel were informed by the court in ruling upon objections to impeaching questions that the witness' answer under oath that he had had no conversation with the defendant upon the subject "would aid the defense, and if it would aid the defense it would damage the prosecution". The jury were instructed that they should disregard and draw no inferences from the remarks of the court or counsel, and that they should consider the evidence only. We find no misconduct of a prejudicial character, nor error in the principles so announced. It follows that authorities cited by appellant in support of these contentions are not in point. ■ We also think a proper and sufficient foundation for such evidence was established. Green, having at first denied any recollection of his former statements, admitted that they were taken by a stenographer, whereupon a transcript thereof was identified and introduced in evidence. The witness thereafter admitted that he had told the truth in the first instance, and reticently acknowledged that he had then made the statements contained in the transcript. This evidence was properly received.

■ Following evidence of the preparation and negotiation of the subject matter of this prosecution as above detailed, various like contracts which had been similarly supplied with names, descriptions and fictitious values, and which had likewise been negotiated as of face value, were offered in evidence and admitted over objections of the defendant. They were not offered as evidence of other offenses, but for the purpose of showing the existence of a fraudulent intent, and a concerted plan of the defendant and others to finance the business by sales of worthless

paper, "for the purpose of overcoming the presumption that the act was innocently or accidentally done without the particular intent which constitutes an element of the offense", and the jury were so instructed. It is argued that these contracts were not admissible for the purpose of proving the *corpus delicti* or of showing the commission of other offenses, that Schwindt was liable under his contract for the amounts therein specified, and that the *corpus delicti* was not proved. However, as previously stated, Schwindt merely authorized the use of his name, though it does not appear in what manner he so intended or expected it to be used, with the express understanding that he should not "have any liability in connection with it". A large number of these purported "contracts", bearing names of persons who had not purchased automobiles, who had paid nothing, whom appellant had intended should not be liable thereon, and from whom nothing was due, furnished instances of a general financing scheme upon one of which Cordish was prosecuted. The People contended that others by lending their names in the accomplishment of appellant's criminal objective had conspired with him and were equally guilty, but the jury were properly instructed that such evidence should be accepted only for the purpose for which it was offered. There was substantial evidence tending to support a finding, as the jury must have found, that money was fraudulently obtained upon one such subterfuge, and the offer of others as evidence of a common intent and plan upon which it was negotiated was not error. "It is a familiar and established rule in this state that even evidence of another crime is pertinent and will not be excluded if it tends logically, naturally, and by reasonable inferences to establish any fact material for the people to overcome." (*People* v. *Sanders,* 114 Cal. 230 [46 Pac. 153].) Evidence of a material fact which tends to show intent or motive, even though it tends to establish another crime, is admissible. (*People* v. *Kizer,* 22 Cal. App. 10 [133 Pac. 516, 518, 521, 134 Pac. 346].)

The *corpus delicti,* i. e., the signing by Cordish of the so-called Schwindt contract and assignment thereof for the purpose and with the intent of enabling Green to complete the swindle, and appellant's knowledge of its perpetration, was sufficiently established to warrant sub-

498

mission of the case to the jury. ■ Evidence was received over objections tending to show a concerted plan of appellant, Fleming, Green and others, to obtain money for financing the two corporations through the negotiation of false evidence of automobile sales. As an asserted incident of their scheme, evidence of an ingenious manipulation of serial, motor and license numbers was offered, and original records of various financing institutions of the purchase of other worthless contracts for a consideration at various times, was introduced. Contentions that such evidence was inadmissible are therefore without merit. Criticism of its weight upon appeal is equally frivolous.

■ The defendant's counsel in argument to the jury expounded at length upon the absence of certain witnesses, to which opposing counsel responded that had it been known prior to the trial what their testimony might have been, they would have been called, but that it was at all times the defendant's privilege to have had them called if their evidence tended to support his defense. In the briefs upon appeal and in his petition for a rehearing in this court, appellant strenuously urged the argument of the district attorney upon this subject as prejudicial misconduct. As stated in our former opinion, we find nothing in the language of the People's counsel which may be so construed. At any rate the point is utterly without merit for the reason that whatever the district attorney said which might otherwise be viewed as objectionable was in reply to argument on the same point by counsel for the defendant. The tenor of the latter's argument is indicated by the following excerpts: "Did the district attorney produce Mr. Marks to prove that he did not authorize Pond to sign his name to this contract? No, and why?" "If they do not produce evidence that is favorable to them, you have got to construe that the evidence would be against them." Rebuttal argument in such instances is not improper. (*People* v. *McRoberts*, 1 Cal. App. 25 [81 Pac. 734].)

■ The remaining points consist of exceptions to the construction placed upon certain evidence by the district attorney's deputies during argument, and to the sufficiency of the evidence as a whole. The statements so made were no more than exaggeration, and they were withdrawn and

the jury were instructed to disregard them. A careful examination of the record, which consists of some four thousand pages, fails to reveal any reversible error, and we think the evidence warranted the verdict and judgment rendered under the instructions given.

The judgment and order denying a new trial are affirmed.

Works, P. J., and Thompson (Ira. F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 31, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 15, 1931.