[Crim. No. 3434. Second Appellate District, Division One.—March 31, 1941.]

THE PEOPLE, Respondent, v. LAWRENCE DUVERNAY, Appellant.

Walter L. Gordon, Jr., for Appellant.

Earl Warren, Attorney-General, and Lewis Drucker, Deputy Attorney-General, for Respondent.

WHITE, J.—An information filed by the district attorney of Los Angeles County charged the defendant with the crime of violation of section 11036 of the Health and Safety Code of the State of California, which section limits and regulates, among other things, the right to sell, furnish, give away or transport narcotics. Following trial before a jury, the defendant was found guilty. This appeal is from the judgment.

Because appellant bases his grounds for reversal upon claimed misconduct of the district attorney and errors of the trial court in the admission of evidence, it becomes necessary to epitomize the factual background surrounding this litigation.

From the record we learn that a police officer assigned to the narcotic detail, accompanied by an operator employed by the police department, first met the defendant on June 3, 1940, upon which occasion the officer had a conversation with reference to the purchase of narcotics. After some discussion the officer gave six dollars to the operator, who departed with the defendant after the latter had instructed the officer to remain in his automobile. Within a period of five minutes the operator returned with a package containing marihuana. Again on June 7th, the police officer contacted appellant and inquired of him whether he had any "stuff", to which appellant replied that he would not deal with the officer because he did not know him, and that if he wanted to get any "stuff" he would have to get Tommy (referring to the operator) to get it for him; that appellant would deal only with Tommy, and that he sold only to some three or four "guys". Thereafter, on June 11, 1940, the officer, accompanied by Tommy

Jefferson, the operator, parked his automobile on 42d Street near Central Avenue. Defendant drove up and parked his automobile across the street. The police operator then went over to defendant's car, and following a short conversation returned to the officer's automobile. Defendant left, but within a short time returned to his car. Thereupon the police operator walked over to the defendant, and then returned to the officer, the latter of whom gave the operator six one-dollar bills, the serial numbers of which were recorded by the policeman. The operator delivered the money to the defendant and then returned to the car and directed the officer to drive to 42d Place, which they waited about ten minutes, when the defendant drove up directly behind the officer's car and sounded his horn. The operator went over to defendant's automobile, whereupon the latter reached down on the seat of the car and handed a package to the operator and immediately drove away. When the operator delivered the package to the officer, examination by the latter disclosed the contents thereof to be marihuana. A short time later on the same day defendant was placed under arrest and the officers found upon his person three of the one-dollar bills theretofore given to the operator and testified by the latter to have been paid to the defendant. The identification of the money was made by comparison with the serial numbers previously recorded by the officer. Upon being asked what had become of the other three one-dollar bills, defendant stated that he had probably lost them in a "crap" game.

Defendant denied his guilt and produced evidence that on the day of his arrest he was in his automobile, which was parked near 42d Street and Central Avenue, with two other men, when the police operator approached the car, but had no conversation about narcotics; that defendant then drove his two friends to their respective homes and himself went to the home of his mother-in-law in company with another friend, where he remained until nearly 8 o'clock, and was then on his way to a prize fight when he was arrested. Several witnesses corroborated defendant in his alibi that he did not return to 42d Place and make delivery of a package to the police operator.

In support of his claim that the district attorney was guilty of prejudicial misconduct, appellant directs attention

to that portion of the record wherein appears the following, which occurred during the cross-examination of a witness for the defense:

"Q. (By the Deputy District Attorney.)   Have you ever made any deliveries for Duvernay?

"A. I did not.

"Q. At any time?

"MR. GORDON (Defense Counsel): I submit this line of questions is incompetent, irrelevant and immaterial; it is not proper cross-examination.

"(Deputy District Attorney): This is to show the interest of the witness.

"MR. GORDON: Interest?   You are assuming a fact not in evidence.   I make my objection on that ground.

"THE COURT: Oh, it is overruled.

"Q. (By Deputy District Attorney): Have you ever delivered anything for Duvernay?

"A. I did not.

"Q. Have you collected money for him?

"A. I did not.

"Q. You have been in trouble in connection with narcotics yourself, haven't you?

"MR. GORDON: Just a moment.   I object to this line of questioning as improper.

"THE COURT: Objection sustained.

"Q. (By Deputy District Attorney): Have you had trouble with the police officers in any way in connection with narcotics?

"MR. GORDON: Just a moment.   Your Honor, at this time I would like to assign the remarks of the district attorney as misconduct on the ground that the objection has already been sustained.   He is pursuing a line of questions that he knows is prejudicial.   He knows it is wrong, and I ask that the jury be admonished to disregard such questioning, and the jury not to draw any inferences therefrom, and I ask that the district attorney be admonished.

"THE COURT: Well, I think probably the first part of that question as to the trouble with the police officers might be

proper. The rest of it will be disregarded and no inference drawn from that phase of it.

"Q. (By Deputy District Attorney): Have the police officers arrested you?

"A. They did.

"Q. And how long ago?

"A. In '38, '38, March of '38—I don't exactly know the date.

"Q. Was that in connection with anything you were doing with this defendant, Duvernay?

"A. It was not."

The questions as to whether the witness had ever "had trouble with the police officers in any way in connection with narcotics", as well as the interrogation as to whether the police had ever arrested the witness and the dates of such arrests, were all clearly incompetent. It is not previous arrest or "trouble with the police" that may be used as the basis of impeachment of a witness, but only the previous conviction of a felony may be shown.

■ The vice of this line of questioning was aggravated when during his argument to the jury the deputy district attorney said:

"In this case, if the court please, and ladies and gentlemen of the jury, the defendant is charged with selling narcotics, the information reading, according to the provisions of the law, 'that the defendant did, on or about the 11th day of June, 1940, at and in the county of Los Angeles, state of California, wilfully, knowingly and feloniously sell, furnish and give away, flowering tops and leaves of Indian hemp, cannabis sativa, in violation of section 11036 of the Health and Safety Code of the State of California'. That, in the legal phraseology, is the offense of selling narcotics—probably the most depraved and lowest thing that I think a human being can do, because it destroys the mentality of the people who use it. *I don't know whether this defendant is a user or not. The characteristics of one who uses narcotics habitually are pretty well known and recognized by one who has any knowledge at all of the matter. The defendant has many of the characteristics of a user of narcotics—*

"MR. GORDON: At this time I wish to cite the remark of counsel as misconduct, as attempting to appeal to the prejudice of these jurors, and I wish that the jury be admonished to disregard his statement, and that he be admonished again. I feel that this is characteristic of his entire prosecution of this case."

Following this objection, the court said, "Well, I think that had better be omitted and the jury will disregard the reference as to the characteristics of the defendant."

The conduct of the deputy district attorney as just narrated called for a more stern rebuke from the court, and it is doubtful whether any admonition to the jury would have removed the effect of such conduct. It would be an impeachment of the legal learning of counsel for the people to intimate that he did not know the aforesaid questions and argument to be improper, wholly unjustifiable, and peculiarly calculated to prejudice the substantial rights of the defendant. Such conduct prevents a defendant from having that fair and impartial trial to which, whether innocent or guilty, he is entitled. Moreover, it may defeat the punishment of crime by jeopardizing a conviction when a defendant is clearly guilty. The challenged remarks of the district attorney are wholly unsupported by the record, and go far beyond the scope of legitimate argument. It is obvious that they were injected into the case for the manifest purpose of prejudicing the jury against the defendant. Such remarks constituted misconduct, and of the fact that such misconduct was prejudicial there can be little doubt. To entertain a contrary view is to ignore human experience and the dictates of common sense. The prosecuting attorney may well be assumed to be a man of fair standing before the jury, and the members thereof may well have thought that he could prove the innuendo contained in the improper questions and the claims he made in his argument concerning the characteristics of the defendant as indicating an addiction on the latter's part to the use of narcotics, had the prosecutor been allowed to do so.

While conceding that "it may be that the prosecuting attorney should have refrained from making the suggestions he did as indicated in the portions of his argument above stated",

respondent nevertheless earnestly contends that ''such argument did not prejudice the substantial rights of the defendant in view of the conclusiveness of the evidence against him and the instruction to the jury to disregard the reference to the characteristics of the defendant''. We are not in accord with the reasoning of the learned attorney-general that the saving grace of section 4½ of article VI of the state Constitution should come to the rescue of this conviction. As was stated by this court in *People* v. *Gilliland,* 39 Cal. App. (2d) 250, 252, 264 [103 Pac. (2d) 179], ''We do not understand section 4½ of article VI of the Constitution as intended to mean that merely because the evidence may legally be able to stand up under the weight of the judgment, that is sufficient reason in all cases for refusing to set aside the judgment. (*People* v. *Davis,* 210 Cal. 540, 556 [293 Pac. 32].)'' There is creditable authority for the statement that the phrase ''miscarriage of justice'', as used in the constitutional provision, ''does not merely mean that a guilty man has escaped or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused, in a given case, to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time deprive them of life or liberty. 'It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure in which the substantial rights belonging to the defendant shall be respected.' '' (*People* v. *Wilson,* 23 Cal. App. 513 [138 Pac. 971].) ▮ In the instant case we do not regard the evidence as sufficient to put into operation the provisions of section 4½ of article VI of the Constitution, because even convincing proof of a defendant's guilt does not necessarily mean, under all circumstances, that there has been no miscarriage of justice. (*People* v. *Mahoney,* 201 Cal. 618 [258 Pac. 607] ; *People* v. *Patubo,* 9 Cal. (2d) 537 [71 Pac. (2d) 270, 113 A. L. R. 1303].) When a defendant is denied that fair and impartial trial guaranteed by law, such procedure amounts to a denial of due process of law. (*Powell* v. *Alabama,* 287 U. S. 45 [53 Sup. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527].)

In the instant case the evidence is in sharp conflict. All of the material facts testified to by the witnesses for the prosecution were denied and controverted, and the defendant, as heretofore indicated, offered several witnesses in support of his alibi. In venturing these last observations we speak, of course, only from the showing made by the record. It is true that the jury had an opportunity to observe the demeanor of the witnesses, and may have had reason to return the verdicts which were found, irrespective of the errors committed during the trial. As to this, of course, we can say nothing. From the mere record, as we read it, however, the errors may have turned the scale in favor of the prosecution. It is the bounden duty of courts to insist that a defendant be fairly convicted, because if he is not so convicted he should not be convicted at all; and to hold otherwise would be to provide ways and means for the conviction of the innocent. The fact that the evidence may point rather conclusively to defendant's guilt does not take from the latter his right to such a fair and impartial trial. Pertinent indeed to the situation with which we are here confronted are the remarks of the court in *People* v. *Black*, 73 Cal. App. 13, 43 [238 Pac. 374], wherein it was said:

"We feel impelled to direct the attention of district attorneys and trial judges to the frequent occasion which is thrust upon us to save judgments of conviction by means of the provisions of section $4\frac{1}{2}$ of article VI of the Constitution. It seems evident that the prosecutors of the state, and possibly that the trial judges, are conducting criminal cases with an eye to the saving grace of the section. It should be manifest that such a course is improper. In the performance of their respective duties incident to trials, the existence of the section is of no concern to those officers. That part of the organic law of the state is of interest, so far as its application is concerned, if we except proceedings on motion for a new trial (see *People* v. *Tomsky*, 20 Cal. App. 672 [130 Pac. 184]), only to the courts of review. District attorneys and trial judges should conduct the trial of criminal cases exactly as if the section did not exist. Such a course, if faithfully and diligently pursued, will lessen the number of appeals, will shorten the time necessary for the consideration of appeals which are taken, will lessen the number of retrials by

superior courts, and will conduce to the general dispatch of business in both trial and appellate courts.''

The judgment is reversed and the cause remanded for a new trial.

York, P. J., and Doran, J., concurred.