[Crim. No. 3445. Second Dist., Div. One.—May 9, 1941.]

THE PEOPLE, Respondent, v. MARK GERALD WYNN, Appellant.

Richard A. Haley for Appellant.

Earl Warren, Attorney-General, and Lewis Drucker, Deputy Attorney-General, for Respondent.

WHITE, J.—In an amended information filed by the District Attorney of Los Angeles County, containing three counts, defendant was accused in each count of the crime of grand theft. The information also contained an averment that defendant had theretofore been convicted of a felony and had served a term of imprisonment in a penal institution as punishment therefor. Following pleas of not guilty and the admission by defendant of the prior conviction charged against him, the cause proceeded to trial before a jury for the third time. In two previous trials, the jury being unable to agree upon a verdict, mistrials were declared. The third trial resulted in conviction of the defendant upon all three charges lodged against him. From the judgment and the order denying his motion for a new trial he prosecutes this appeal.

The factual background of this prosecution, as revealed by the record, is that in the early part of 1939 defendant presented and introduced himself at the office of the Carlton Finance Company to Lloyd T. Leary, the company manager. Upon this occasion he borrowed money on his automobile and

informed Leary that he handled a considerable number of automobiles and would finance his contracts thereon with the Carlton Finance Company. It was Leary's duty as manager of the finance company to investigate and pass upon loan applications and to inspect automobiles or other personalty offered as security for loans. When an automobile upon which a loan was asked could be put in standard running order without an expenditure of more than $20 Leary was authorized to make a loan thereon. The applicant for a loan was required to fill out a credit application, and upon approval of such application by Leary a promissory note and chattel mortgage were executed by the borrower. After many transactions in which money was lent by the finance company to the defendant through Leary upon automobiles as security, there is evidence that about the middle of July, 1939, Leary commenced the practice of approving loans of the defendant without the formality of inspecting the automobile offered as security. In connection with the abandonment of the practice of inspecting automobiles, it appears in the record that about the middle of July, 1939, defendant, accompanied by a Miss Lester, came to the office of the finance company for the purpose of obtaining a loan upon an automobile. During the negotiations Miss Lester apparently changed her mind and informed defendant in the presence of Mr. Leary that she would rather not go through with the transaction; that the car was not in as good condition as it should be and had been rather badly wrecked; that she did not know whether defendant would be able to fix it, and therefore felt she would rather not obtain the loan. At that time it appears that Leary inquired of defendant, ''What is this business about the automobile being wrecked?'' to which the defendant replied, ''Yes, some of them have been wrecked; they are damaged and some of them are being fixed.'' According to Mr. Leary's testimony, he then informed defendant he was sorry, but he could not make loans on wrecked automobiles; that he would talk to Mr. Mandel, the owner of the finance company; but that pending such conversation he would make no loans upon cars that were in a wrecked condition; whereupon defendant replied, ''I am sorry, but you have been financing a few cars that are wrecked and you will have to go through with it because you have been putting the deals through. You will have to go along with me and play ball with me until everything is

straightened out. It will come out all right, don't worry about it." According to Leary's testimony, up to that time he was in ignorance that any of the automobiles theretofore pledged by defendant were wrecked cars, but from that time on Leary made no attempt to inspect any of the automobiles in the subsequent deals presented by the defendant. Thereafter numerous transactions were entered into whereby defendant received loans on wrecked automobiles, and during which time Leary at the request of the defendant obtained from the owner of the finance company a three per cent overriding commission for the defendant's bringing in so much business, and out of which commissions Leary was paid between $200 and $500 by the defendant over a period of time. Neither Leary nor defendant ever informed Mr. Mandel, the owner of the finance company, that loans were being made upon wrecked cars, according to their testimony. The record indicates that Mr. Leary had the confidence of the owner, the latter of whom signed the loan checks presented for his signature after approval by Leary. The two secretaries of the owner were also authorized, during his absence, to jointly sign checks upon any deal approved by Leary. It further appears that Leary received various sums of money between August and November, 1939, from the defendant, and that the latter overhauled Leary's personal car and did some other work for him gratuitously.

The loans received by defendant from the finance company approximated $30,000, and of about 100 transactions, all automobiles offered as security by defendant were wrecks, with the exception of eight or ten. According to Mr. Mandel, owner of the company, when he discovered the condition of the automobiles which had been taken by his company as security for loans, he repossessed the wrecks and salvaged them through wrecking dealers, suffering a net loss of some $18,000, as well as the loss of his business, which he was compelled to liquidate.

The charges contained in the information are predicated upon the following facts: On August 8, 1939, one William McKeel, a barber, had a conversation with defendant in which the latter requested him to sign some papers in connection with an automobile. McKeel was not interested in buying or borrowing money on an automobile, but was informed by defendant that the latter had nine cars registered in his name

and that if he obtained another he would be required to secure a dealer's license. McKeel signed a promissory note and chattel mortgage in blank, but never received any part of the loan covered by the note, nor did he make any payments provided for therein, being assured by defendant that the latter would make such payments. These documents were presented to the finance company by defendant, whereupon Mr. Leary, without inspecting the automobile, and without the presence of the mortgagor, McKeel, issued a check in the sum of $340 in favor of defendant. The automobile given as security in this transaction was subsequently discovered by the owner of the finance company, according to the latter, in a wrecking yard. A picture of the wrecked automobile was introduced in evidence, and on the day of his arrest defendant admitted the picture of the wrecked car represented the condition of it when it first came into his possession.

The second count is predicated upon the fact that in October, 1939, Stanley Noyes signed a promissory note, chattel mortgage and loan application all in blank, and in November, 1939, signed a conditional sales contract and loan application in blank, at the request of defendant. As such signer, he received no money, nor did he make any payments. In fact, he did not even know that defendant was going to use the papers to borrow money from a finance company. The papers in question were presented in person by defendant to Leary at the finance company, and the latter, without inspecting the cars, and knowing they were in a wrecked condition, nevertheless gave defendant $425 on October 14, 1939.

In another instance, it appears that Wiley Lawrence McGrew was employed by defendant at his shop in Inglewood and was requested by defendant to sign several promissory notes and chattel mortgages in blank, and also a loan application which was presented by defendant to the finance company. It further appears that defendant informed McGrew that if the latter wanted to work for defendant he would "have to play ball with him". One set of papers signed by McGrew in blank was found in Leary's desk after the latter had terminated his employment with the finance company.

In the latter part of 1939, according to Mr. Mandel, he became aware of the fact that a number of loans were delinquent, and an examination disclosed that 90 per cent of the delinquent accounts were those of defendant. Mandel at-

tempted to get in touch with the defendant, and finally located the latter's shop in Inglewood and also a storage place, the latter of which he found was filled with wrecked automobiles. Although at about this time Leary was having meetings with defendant, he denied to Mr. Mandel any knowledge of defendant's whereabouts or of the location of his place of business.

At the time of his arrest defendant was registered at a hotel under an assumed name and had also disguised his appearance. This, he claimed, was done to give him an opportunity to remain at large until arrangements could be made to enable him to furnish bond. On the day of his arrest he had checked out of one hotel and made arrangements to rent a room in another at which he had given another assumed name.

■ Appellant first contends that the evidence is insufficient to sustain the verdicts. This contention is without merit. There is abundant evidence to show, if believed by the jury, that appellant combined with Leary as manager of the finance company to fraudulently obtain, and did fraudulently obtain, money of the finance company. The evidence is ample to show an intent to defraud, the commission of an actual fraud, the use of false pretenses for the purpose of perpetrating the fraud, and the accomplishment of the fraud by means of the false pretenses, the latter of which caused the finance company to part with its property. All these elements having been proved, the offense formerly known as obtaining money under false pretenses and now known as grand theft, was established.

Upon the authority of *People* v. *Payton,* 36 Cal. App. (2d) 41, 53 [96 Pac. (2d) 991], decided by this court, we hold that in the case before us there is a memorandum in writing which meets the requirements of section 1110 of the Penal Code, such memorandum consisting of the conditional sales contracts executed by defendant and the chattel mortgages upon worthless automobiles. There is abundant evidence that the writing and false token in the instant case served to carry out the false pretense that the security was *bona fide.* The conditional sales contract signed by defendant as seller and Stanley Noyes as purchaser contains, for instance, the following: ''The purchaser hereby acknowledges receipt of the said personal property and agrees that he has examined the same and that it is in good order and good repair.'' There is in the

record evidence which established that defendant knew that the automobile referred to in the contract was not in good order and repair, but was a wrecked and worthless automobile, and that when he presented the mortgages and financing papers he did not intend to purchase the automobiles referred to; that the same in fact belonged to him, and that the collateral represented by the mortgage was absolutely without worth. All these documents, therefore, presented by defendant in the transactions were false tokens—false representations of existing facts. There is more than sufficient evidence to warrant the jury in determining that Leary, the manager of the company, and the defendant conspired together to conceal from the owner of the company the condition of the collateral, and that working in conjunction with each other they obtained money from the company upon the representations that the mortgages and collateral were *bona fide*.

Appellant's contention that no loss was suffered by the finance company in the transactions which formed the basis of the three counts of the information because no payments were delinquent upon these particular contracts, is answered by the fact that the offense is complete when the money is obtained by the use of false means, and the defendant is not purged of culpability even by subsequent restoration, restitution or repayment. The offense is against the people of the state. The victim is not a party to the action, and can in no case make a settlement affecting to any extent the rights of the plaintiff state. Further, as heretofore narrated, there was a showing of a loss of some $18,000 as a result of defendant's alleged perfidy. All the facts and circumstances surrounding the transactions mentioned in the information and other similar transactions, if true, clearly point to a scheme, plan and design on the part of appellant from the outset of his business dealings with the finance company to foist upon that company wrecked automobiles, and the same circumstances also tend strongly to prove guilty knowledge and criminal intent. (*People* v. *Cordish,* 110 Cal. App. 486 [294 Pac. 456]; *People* v. *Hand,* 127 Cal. App. 484 [16 Pac. (2d) 156]; *People* v. *Ingles,* 117 Cal. App. 22 [3 Pac. (2d) 341].)

Appellant's contention that "the testimony of the accomplice is not sufficiently corroborated" cannot be sustained. That Leary was an accomplice is beyond question. A mere reading of the facts hereinbefore set forth shows abundance

of corroborative testimony and circumstances, independent of Leary's testimony, all serving to corroborate the latter and to connect appellant with the commission of the offenses. There being in the record other evidence which measures up to the requirement of section 1111 of the Penal Code, tending to connect the defendant with the commission of the crime charged, the jury was entitled to consider the testimony of the accomplice the same as any other testimony and to give to it such weight as the jurors might conclude it was entitled to.

Upon the authority of *People* v. *Edwards,* 72 Cal. App. 102, 112, 113 [236 Pac. 944], we would be warranted in saying that the evidence is also sufficient to sustain the verdicts of the jury upon the theory of larceny by trick and device.

The defendant testified that since 1929 he had been in the auto reconstruction business in Los Angeles; that he was licensed to resell automobiles purchased by him; that in 1939 he operated a used car lot in Inglewood where he resold automobiles reconditioned by him in a factory conducted by him for that purpose. Defendant further testified that he had purchased as many as a dozen wrecked automobiles from the Carlton Finance Company, and that the purchase price of most of them was financed by the company owned by Mr. Mandel. He further testified that he maintained two shops in which he carried on the business of rebuilding automobiles; that Mr. Mandel was aware of that fact, and further, had visited one of such shops on several occasions. It was further testified that Mr. Mandel was at all times aware of the fact that the automobiles upon which defendant obtained loans were wrecked cars; that having obtained a loan thereon, he would use such money to recondition the automobiles, resell them, and from the proceeds of such resales pay off the incumbrance to the finance company. Defendant further denied that he ever threatened or coerced Mr. Leary into making loans on wrecked cars without inspection thereof, as testified to by the finance company manager. It is further in evidence that it was at the suggestion of Mr. Mandel that defendant used names other than his own in obtaining loans upon used automobiles from the finance company; that Mr. Mandel indicated that such procedure would facilitate his discounting the paper at the bank.

In his defense defendant established an irreconcilable conflict with the testimony given by the finance company owner and the manager thereof. Had the jury chosen to believe the defense testimony, it would have absolved defendant of having made any false or fraudulent representations to the finance company or of practicing any deceit, trick or device upon such company.

In the instant case we are again confronted with a charge of serious misconduct on the part of the deputy district attorney. In support of his claim in that regard appellant directs our attention to that portion of the record reflecting what occurred during the cross-examination of defendant while testifying as a witness in his own behalf. It is as follows:

"Q. Were you, on or about the 28th day of January, 1937, in Ramsey County, Minnesota, convicted· of forgery in the second degree by your plea of guilty thereto, and did you serve a term of imprisonment for that felony in a penal institution in the state of Minnesota?

"A. I was convicted, served 22 months and was later cleared of the charge and released.

"Q. You served 22 months and were paroled and then skipped your parole and came to California, didn't you?

"A. I served 22 months and was paroled pending pardon and I left for here after I stayed there 13 months and served out my parole.

"Q. You never got that pardon, did you?

"A. Because I have never gone back for it.

"Q. Do you know that the warden of the penal institution in which you served 22 years would be glad to have you come back there?

"A. 22 months, you mean.

"Q. You owe six months more there on your present sentence, don't you?

"A. Not to my knowledge, and I doubt it very much.

"Q. At any rate you pled guilty to the felony?

"A. I pled guilty the same way that Lloyd pled guilty to that charge because I was badgered and promised a whole lot for doing it.

"Q. You did what?

"A. I said I pled guilty to that charge just the same as Lloyd Leary pled guilty to his charge, because I was forced into it.

"Deputy District Attorney: Move to strike out the answer.

"The COURT: It may go out, the Court will take the witness.

"Deputy District Attorney: That was an automobile forgery, wasn't it?

"A. That was a new car contract. At the time I was a dealer there."

 This line of inquiry went far beyond that allowed by law, for a cross-examiner's questions must be limited to the fact of conviction and the nature of the crime; he may not go into the details or circumstances surrounding the crime (*People* v. *David*, 12 Cal. (2d) 639 [86 Pac. (2d) 811]; *People* v. *Chin Hane*, 108 Cal. 597 [41 Pac. 697]; *People* v. *Muchupoff*, 79 Cal. App. 306 [249 Pac. 240]); and certainly the cross-examiner cannot delve into the question of the length of time served and conditions or circumstances surrounding the parole of a defendant. It would belie human experience and challenge common sense to say that such conduct was not prejudicial. True, no objection was made nor was the court requested to admonish the jury to disregard such questions and any inferences to be drawn therefrom, but it is extremely doubtful, as well as improbable, that any objection or admonition to the jury would have removed the effect of such conduct. Undoubtedly the jury may well have thought that the prosecutor could have proved the truth of his charge of parole violation on the part of defendant and that the latter was a fugitive from justice, had the district attorney been permitted so to do. In the recent case of *People* v. *Duvernay*, 43 Cal. App. (2d) 823 [111 Pac. (2d) 659], this court emphasized the fact that the phrase "miscarriage of justice", as used in section 4½ of article VI of the Constitution, is not intended alone to mean that a guilty man has escaped or that an innocent person has been convicted, but that the term is equally applicable to cases where the acquittal or conviction has resulted from some form of trial in which the essential rights of the people or the defendant were disregarded, ignored or denied. Every defendant has the unquestioned right to a fair trial, conducted substantially in accordance with law. Prose-

cuting officers must learn that the doctrine which proclaims that respect for the law cannot be inspired by withholding the protection of the law from the accused, is one which recognizes no exceptions. Whether guilty or innocent, the defendant was entitled to have his case fairly tried according to the established rules of law, and, as said by a learned judge, "Though unfair means may happen to result in doing justice to the prisoner in the particular case, yet justice so attained is unjust and dangerous to the whole community." (*Hurd* v. *People,* 25 Mich. 405.)

While misconduct on the part of a prosecuting officer such as appears in the case before us cannot be condoned and is never to be excused, it is true that cases may arise wherein a reversal would not be justified; where, for instance, the evidence is such as to amount to a complete demonstration of guilt, and the appellate tribunal can say that though the misconduct had not occurred a guilty verdict was inevitable. However, the case with which we are here concerned does not present such a situation, because it cannot be said with any degree of certainty to what extent, if at all, the jury was influenced by the questions of the district attorney which the defendant asserts amounted to misconduct. The fact remains that upon two previous trials the jurors therein disagreed upon the question of whether the defendant willfully and unlawfully made the representations attributed to him, or whether the finance company owner and his manager, the latter of whom from the witness-stand admitted his own perfidy, knew at all times that the automobiles offered by defendant as security for loans were wrecked. Undoubtedly the charges made by the district attorney against the defendant as to parole violations, for which charges there was absolutely no support in the record, militated heavily against him. The conduct of the district attorney therefore resulted in a miscarriage of justice entitling the defendant to a new trial. (*People* v. *MacPhee,* 26 Cal. App. 218 [146 Pac. 522] ; *People* v. *Podwys,* 6 Cal. App. (2d) 71 [44 Pac. (2d) 377] ; *People* v. *Duvernay, supra.*)

The order denying a new trial and the judgments are, and each of them is, reversed, and the cause remanded for a new trial.

Doran, J., concurred.

YORK, Dissenting.—I dissent. I cannot agree with the foregoing opinion of this court by reason of the provisions of section 4½ of article VI of the Constitution which provides:

"No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

Although I agree that the conduct of the district attorney was reprehensible and highly improper, nevertheless, the manner in which appellant answered his questions permitted him to improperly get before the jury evidence which mitigated the damage done. The trial court of its own motion should have instructed the jury to disregard a great many of the remarks of the district attorney which remarks were inserted in the questions put to the appellant.

The district attorney knew it was improper to ask the witness a question in the following form: "Q. You served 22 months and were paroled and then skipped your parole and came to California, didn't you?" However, the reason this question is insufficient in this particular case upon which to base a reversal of the judgment, and the reason it comes within the saving grace of the constitutional provision hereinbefore quoted, is because of the answer given by appellant to a question just previously asked of him, to wit: "A. I was convicted, served 22 months and was later *cleared of the charge and released.*" This was then followed by appellant's answer to the question heretofore quoted, to wit: "A. I served 22 months and was *paroled pending pardon* and I left for here after I had stayed there *13 months and served out my parole.*" (Italics added.) The district attorney then asked: "You never got the pardon, did you?", to which appellant answered: "Because I have never gone back for it." Then followed the question which was highly improper, but which appellant by his reference to having been "cleared of the charge" goaded the prosecuting officer into asking: "Do you know that the warden of the penal institution in which you served 22 years would be glad to have you come

back there?" The witness answered: "22 months, you mean." The district attorney then asked: "You owe six months more there on your present sentence, don't you?", to which appellant replied: "Not to my knowledge, and I doubt it very much."

If direct answers had been made by appellant to the questions propounded by the prosecuting officer, I would agree with my associates as to a reversal, but I believe this case comes within that class of cases which the above quoted constitutional provision was adopted to cover, as the answers of appellant more than offset any prejudice that might have been created by the prosecuting officer's method of improperly questioning the appellant.

The main opinion states in abbreviated form the evidence against appellant. After an examination of the entire record, including all of the evidence, I am of the opinion that there was no miscarriage of justice in the conviction of the appellant. In fact, I believe it is an almost complete demonstration of guilt.

Respondent's petition for a hearing by the Supreme Court was denied June 6, 1941.