[Crim. No. 1174. Fourth Dist. May 27, 1958.]

THE PEOPLE, Respondent, v. FLOYD JACKSON
HUDSON, Appellant.

Floyd Jackson Hudson, in pro. per., and Dennis D. Hayden, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and John A. Vander Lans, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with the attempted burglary of a building known as the "Right Road Café" on May 13, 1957. He was also charged with prior convictions as follows: first degree robbery in San Bernardino County on June 19, 1927; second degree robbery in Tehama County on November 4, 1929; escape in Marin County on May 24, 1935; manslaughter in Sacramento County on July 24, 1939; escape in Lassen County on January 29, 1944; second degree burglary in Riverside County on August 5, 1947; and attempted burglary in Midland County, Texas, on August 12, 1954. While he was represented by the public defender the defendant pleaded not guilty and denied all the prior convictions alleged. At the request of the defendant the public defender was relieved as his counsel, but was instructed to appear at the trial, and the defendant conducted the trial in propria persona. A jury found the defendant guilty of attempted burglary as charged, finding it to be burglary in the second degree, and also found that he had suffered six prior convictions as set forth in the information, as amended. His motion for a new trial was denied and in sentencing him to prison the judge found that the defendant "was not adjudged a habitual criminal." He has appealed from the order denying his motion for a new trial.

 It is first contended that the evidence was insufficient to establish the crime of attempted burglary. After closing his place at 2 a. m. on May 13, the owner of the Right Road Café proceeded to pick up the night's receipts including some checks. He also picked up a .38 pistol which was in the place where he kept the checks. Hearing a noise at the skylight above his head he fired a shot in that direction. After firing the shot he did not hear any further noises. About daylight that morning the defendant found the body of his nephew, Jackie Ecord, in a lumber yard which adjoined the building in which this café was located. A pile of lumber near this building gave easy access to the roof of the café. A little later the defendant informed an officer of the finding of Jackie's body, and he was taken to the scene and then detained.

The officers found that portions of the metal stripping which held the glass in this skylight had been removed and were lying on the roof of the café. Blood was found on the skylight, which had a hole in it indicating that a bullet had passed from the inside toward the outside. There was a trail of blood leading from the skylight for a distance of 215 feet, to the place where Jackie's body was found. On the roof of the café near the skylight the police found a screwdriver, a short crowbar, a hatchet, a pair of pliers, a piece of rope, a roll of masking tape, and a piece of lumber 14 feet long. They also found a flashlight along the path of blood and near the edge of the roof. The defendant admitted that Jackie had told him that he (Jackie) was planning to enter this place to get money which he had been told the owner kept secreted there. The uncontradicted evidence is amply sufficient to establish an attempt on the part of Jackie to enter this building for the purpose of committing theft.

Jackie, who was 15 years old, lived with the defendant and the defendant's mother, although the mother was not at home at this time. The wife of the owner of this café testified that the defendant and a boy about 15 or 16 years old entered the café about 6 p. m. on May 12, and stayed 15 or 20 minutes; that they bought nothing while there; that when they left they crossed the street and looked up toward the café; and that they then recrossed the street to their car and drove away. A witness who lived across the street from the defendant testified that he went to the defendant's home shortly before 1 a. m. on May 13, to ask Jackie to baby-sit for him while he went to this café to pick up his wife who worked

there; that when he went there the defendant was dressed and Jackie was lying on the bed; that Jackie refused his request saying that he was pretty tired and wanted to go to sleep; that he got another baby-sitter and then went to this café; and that when he arrived the defendant was there. The wife of this witness testified that she saw the defendant enter this café about 1 a. m. on May 13; that he stayed until the café closed; that as she left she saw the defendant talking to a man outside the café; and that at 3 a. m. she saw the defendant return to his home.

Two officers and a deputy district attorney had a conversation with the defendant on May 16. At that time the defendant stated that he had recently returned from a trip back east and discovered that Jackie was knee-deep in crime; that he tried to talk the boy out of it but was unsuccessful; that he decided that as long as he could not talk the boy out of becoming a criminal he would give him the benefit of his experience, in an attempt to help the boy escape detection and possible injury while on one of his burglaries; that just prior to his going to this café that night Jackie talked to him about his plan to burglarize this café, saying that he had information that the owner kept a substantial sum of money hidden on the premises; that he tried to persuade Jackie not to commit the crime, but when he was unable to do so he felt that he should at least go look the place over and see what it looked like; that he went down to check the joint over and he had told the boy to hit it just before daylight, as that was the best time; that when he left the café he helped a man who had been injured in a fight there; that he then returned to his home and found that Jackie was gone; that he then remembered that he had told Jackie not to pull the job early in the evening but the best time would be around daylight when there would be less chance of being caught; that he then returned to the café, drove around to the back and gave the signal that he and Jackie always used; that he would flip his lights on high, then on low and then back on high and look for Jackie's return signal; that Jackie would return the signal by flashing a light back at him when he wanted to come down and meet him; that Jackie had the flashlight on the roof for that purpose; that when Jackie did not answer his signal he became worried and drove around to the front of the café, and got out and looked in the door to see if a rope was hanging down and to see whether Jackie was there or not; that he could

not see a rope and Jackie was not there, so he returned home and then went out to search for Jackie at other places where he might be pulling a burglary; that he was unable to find Jackie after driving around and again went home but was unable to sleep; that he then drove out again to look for the boy and at that time observed a body lying in the lumber yard; that he found the boy was not alive and pulled off the gloves the boy had on his hands; that he then returned to his home but being nervous and excited he left again and went back to the area; and that he then observed a police officer and informed him of the incident as best he could. About a week later the mother, who had returned, turned over to the officers a pair of gloves which she had found in the house. These were rubber gloves with a dark colored substance on them, which she had found folded in between a tablecloth. The mother told the officers that she had never seen the gloves, that from the way they were hidden among her good linens she felt they did not belong in the house, and that for this reason she reported it to the officers. The defendant stated that he knew nothing about the gloves but that they looked like a pair of gloves which he owned and which he used in his work. He had first told the officers that there were no gloves on the boy's hands when he found the body, and later told them that he had removed the gloves from the boy's hands, but did not remember what he had done with them.

The defendant testified that the boy had talked to him about entering this café and getting the money he had heard was kept hidden there; that he himself only talked to the boy about burglaries in general; and that he had not talked to the boy about this particular burglary. His defense was that he had merely tried to persuade the boy not to engage in crime, and that the officers had misconstrued the statements he had made to them. He made evasive answers to many questions which called for a direct answer on material facts, and his extended explanation of what he had said and done in connection with this incident was far from satisfactory. The manner in which the defendant testified and what he there said would naturally tend, in many respects, to support the testimony of the officers as to what the defendant had told them. The evidence, with the inferences which could reasonably be drawn therefrom, was amply sufficient to sustain the implied finding of the jury that the defendant aided, advised and encouraged Jackie in the attempted burglary

of this café. In fact, the evidence to that effect appears from the record to be very strong.

It is next contended that error was committed by the trial court in divulging to the jury details concerning one of the alleged prior offenses. It is argued that in reading from the record of the conviction in Lassen County the judge stated that the information charged the defendant with stealing a Plymouth coupé owned by one Ada Mae Stephens, and that the judge by his later questions brought out the length of time the defendant had served in certain prisons. The case of *People* v. *Wynn,* 44 Cal.App.2d 723 [112 P.2d 979] is relied on in support of the contention that this error requires a reversal. In that case the appellant had admitted the prior conviction and there was no occasion for proving that conviction or for interjecting the erroneous matter into the record. Moreover, the record disclosed that the question as to the guilt of that appellant was a very close one, the jury having disagreed on two previous trials, and the district attorney had also charged a parole violation for which there was no support in the evidence.

A quite different situation appears in the instant case. It does appear here that there were errors in the allegations of prior convictions in the original information on which the defendant went to trial. At some time during the trial, the exact time not being disclosed by the record, the information was amended by interlineation in the following respects. In the first prior the crime charged was changed from first degree robbery to second degree robbery, and the date of judgment from June 19, 1927, to February 11, 1928; in the second prior the crime charged was changed from second degree robbery to escape; the third prior was eliminated; in the fourth prior the date was changed from July 24, 1939, to December 9, 1935; in the fifth prior the crime charged was changed from escape to grand theft, and the date from January 29, 1944, to January 24, 1944; in the sixth, the date was changed from August 5, 1947, to August 28, 1947; in the seventh prior the date was changed from August 12, 1954, to August 3, 1954. The matters were submitted to the jury and the verdicts returned, based on the allegations in the information as amended.

On his arraignment the defendant had denied all the prior convictions alleged. On the first day of the trial, in chambers and before the jury was impaneled, the court told the defendant that he wanted to get the matter of the priors straightened out "before we get in there before the jury." The court

explained to the defendant that evidence would have to be put on concerning the priors if they were denied; that if he admitted the priors and did not take the stand the jury would know nothing about the priors; that if he took the stand he could be asked about the priors for the purpose of impeaching his testimony; and that if he planned on eventually admitting the priors this was the time to do it. The court then asked the defendant if he was still denying the priors and the defendant replied that he was, "because they are not true in the record," but did not indicate in any way what he referred to. The defendant also stated that he intended to take the witness stand; that as far as the priors were concerned he had made a good rehabilitation and people would testify in the case to that effect; that he saw no reason to hold back anything; and that "I see no reason to hold back those priors."

After the People rested the defendant called the minister of his mother's church, who testified that he had known the defendant for a year and that during that time his reputation was good. The defendant then took the stand and the judge told him to give his testimony in narrative form, but stated that he would first like to go through the priors to get them "in order and so the jury may know exactly what the situation is." The judge then stated "As I understand the situation, you don't deny your previous difficulties with the law, you merely want to get them straight?" The defendant replied that this was correct, and when asked if he claimed that the way it was set forth in the information was not correct, he replied "Yes." The judge then went through the certified copies which had been introduced in this connection, taking them in chronological order and asking the defendant whether they were correct. Instead of denying them the defendant admitted six of them with certain changes which he suggested. It was thus brought out that in the first prior in San Bernardino County a reversal was followed by a second trial resulting in a conviction of second degree robbery, and the judge stated that this was only one conviction. The defendant admitted that he had been convicted of escape in Tehama County on November 24, 1929, but explained that this was in Tehama County and not in Marin County. He admitted a conviction of manslaughter in Sacramento County on December 9, 1935, a conviction of grand theft in Lassen County on January 24, 1944, and a conviction in Riverside County on August 28, 1947. He also admitted a conviction in Midland County, Texas, in 1954, explaining that after an appeal that sentence

had been reduced from seven years to two years. The statement that an automobile belonging to Ada Mae Stephens had been stolen came through a reading of a part of the record in the Lassen County case, and the remarks about the length of time served came in connection with the effort of the judge to straighten out the dates of the various convictions, in which the defendant cooperated freely and twice pointed out that he had served more time than the judge had stated.

It clearly appears that the defendant willingly admitted six prior convictions while on the stand, but claimed certain errors in the way they were alleged, as a result of which they were corrected by amendment. The defendant was given ample opportunity to point out any such errors and have them corrected before the jury was impaneled, but at that time denied the priors without informing the court of his real contentions in that regard. It was here necessary to prove the priors, and apparently the judge had then ascertained that the defendant admitted that he had suffered prior convictions but claimed that certain errors existed in the way they were alleged. The defendant expressed a desire to have these errors corrected and he freely stated the facts which led to the corrections. Whether or not the defendant was intentionally using his past experience in convictions and in appeals for the purpose of laying the foundation for a claim of error here, it rather clearly appears that he invited any errors in this connection on which he now relies. Under these circumstances, and in view of the evidence, it cannot be held either that a different verdict could reasonably have been expected in the absence of such error or that a miscarriage of justice appears, within the meaning of article VI, section 4½ of the Constitution.

The final contention is that the fact that the information contained errors in alleging the prior convictions caused the defendant to deny the prior convictions and thus led to the reading of the original information to the jury, thereby depriving him of a fair trial. In support of this contention *People* v. *Colombo,* 70 Cal.App. 489 [233 P. 413] is cited. In that case, the court stated that when a defendant is arraigned on a charge alleging a certain prior conviction he is not called upon to state he has suffered a different prior conviction. It was held, under the circumstances of that case, that the substantial rights of the defendant were prejudiced, but it was pointed out that where the defendant has had an opportunity to admit the previous convictions his rights would not be prejudiced.

We do not regard that case as controlling under the circumstances which here appear. Much of what we have previously said is applicable in considering the contention here made. Section 1009 of the Penal Code, after providing that an information may be amended at any stage of the proceedings, provides in part that "The defendant shall be required to plead to such amendment or amended pleading forthwith, . . . and the trial or other proceeding shall continue as if the pleading had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, . . . may be granted." In the absence of any showing to the contrary it must be presumed that the court did its duty in this regard. It does not appear that any postponement was asked for, nor that the rights of the defendant were prejudiced by the failure to grant a postponement. The defendant had an opportunity just before the jury was impaneled to avoid the effect of an amendment at a later time and, after being told by the court what was to be expected if the priors were denied, he stated in effect that he had no objection to having the matter of his prior convictions brought out. While he apparently intended to admit six prior convictions when he took the stand, he did not inform the court of the existence of the errors at that time, when the matter could have been easily corrected. Again, when he took the stand, in reply to a question asked by the judge he stated that he merely wanted to get the priors straight. He then cooperated in bringing out the true facts. Instead of standing on his rights as they would have existed under the original information he took an active part in bringing about the corrections and changes of which he now complains, and in a very real sense invited the situation which resulted. In our opinion, his substantial rights were not prejudiced under these circumstances by the reading of the original information, or by the fact that the trial proceeded "as if the pleading had originally been filed as amended." While error appears, it would be unreasonable, in view of the record as a whole, to believe that this error in any way affected the verdict, and we are far from convinced that any miscarriage of justice has occurred.

The order appealed from is affirmed.

Griffin, J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 23, 1958.