[Crim. No. 3716.   Second Dist., Div. One.   Aug. 5, 1943.]

THE PEOPLE, Respondent, v. CHARLES JAMES LYNCH, Appellant.

Frederick H. Vercoe, Public Defender, and William B. Neeley, Deputy Public Defender, for Appellant.

Robert W. Kenny, Attorney General, and Elizabeth Palmer, Deputy Attorney General, for Respondent.

WHITE, J.—Through an information filed by the District Attorney of Los Angeles County, defendant was accused in count 1 thereof with the crime of burglary, while count 2 charged the offense of attempted burglary, both crimes allegedly committed on the 26th of November, 1942. In connection with each count of the information, it was also alleged that prior to the date thereof, defendant had suffered four prior felony convictions and that for each of said prior felony convictions defendant served a term of imprisonment in the state prison.

To the aforesaid information defendant pleaded not guilty and not guilty by reason of insanity. Trial before a jury resulted in the conviction of the defendant of the crime of burglary as charged in count 1 and his acquittal of the offense alleged in count 2. The issue raised by the plea of not guilty by reason of insanity was subsequently tried before the same jury which returned a verdict that the defendant was sane. A motion for a new trial was made by the defendant and denied by the trial court. In all of the proceedings up to and including the denial of his motion for a new trial, the defendant appeared in propria persona. After denial of the motion for a new trial, the court appointed the public defender of Los Angeles County to represent the defendant, and thereafter, with the consent of the court, the motion for a new trial was renewed and, following argument thereon by counsel, was again denied. This appeal is from the final judgment and the order denying defendant's motion for a new trial.

The factual background surrounding this prosecution, as reflected by the record, may be thus epitomized. Mrs. Myrtle Keeney testified that she left her home in the city of Pasadena about 8:15 on the morning of November 26, 1942, and did not return home until 7:30 o'clock that evening. As she approached her home she observed a light burning in the front bedroom thereof. Entering her residence through the front door, Mrs. Keeney proceeded through the dining room and into the bedroom where she observed a man seated on the bed with his head in his hands. She first thought the man was her brother and inquired of him as to whether he was sick. Upon being addressed, the man looked up but made no reply, but Mrs. Keeney saw he was not her brother. To Mrs. Keeney the man appeared to be "either drunk or sick." The witness noticed that either one or two of the bureau drawers, which had been closed in the morning, were open

but nothing was missing. Mrs. Keeney then went back through the dining room and left the house to telephone the police. She observed the man follow her from the bedroom to the dining room from which point he watched her leave the house, after which he went out the front door. After a few minutes' absence Mrs. Keeney returned to her home with the police officers.

Investigation disclosed that the hook holding the back screen door of Mrs. Keeney's residence had been pulled out in order to open the door and two panes of glass about 8"x10" in the back door had been broken out and the shattered glass had fallen upon the floor. There was also blood on the floor and a small fragment of flesh caught in the glass. When the panes of glass had been knocked out, it was easy to reach in and turn the key which unlocked the rear door. There was some tobacco scattered around in the kitchen, approximately enough with which to roll a cigarette. Burned matches were found on the screen porch, in the kitchen, dining room and bedroom, but in no other parts of the house. An empty pint wine bottle was also found in the home. The investigating police officer arrived at the Keeney residence about 8 p. m. After making an examination of the house, the officer returned to the police car, parked in the front of the premises, at about 8:30 o'clock. As he was getting into the automobile the officer observed the defendant walking south on Raymond Street. It is apparent, from the officer's testimony given at the preliminary examination, that his attention was attracted to the defendant by reason of the latter's apparent intoxication. After some conversation at the police car with the defendant, the officer took him before Mrs. Keeney who identified him as the man she had found in her home when she returned that evening. The police officer testified that the defendant "was very intoxicated"; that when first taken to Mrs. Keeney's home the defendant "wanted to. know what it was all about." Regarding his conversation with the defendant, the officer stated that the former's answers were "fairly coherent and understandable though not entirely clear" but "he was able to answer questions to a certain extent." In the course of his interrogation of the defendant, the officer asked him "What were you doing in the house" to which the defendant, according to the officer, replied in substance "Well, you know as well as I do. I was trying to steal something." Upon his arrival at the police station, defendant was given a blood test

for alcoholism. This reflected 3.06 of alcohol. According to the police officer, he had given this test on numerous occasions during his career as a police officer, and when asked as to the degree of defendant's intoxication as reflected by such test, the officer replied "that he was very intoxicated." According to the jail records, the defendant was booked for "investigation as to the burglary charge and for intoxication." When searched at the police station, defendant had no cash, and among his personal effects was no property belonging to the complaining witness. Either a day or two days after his arrest, the defendant was interviewed by another officer, who testified that at that time the defendant "showed that you had been under the influence of liquor previous to that time and you were very nervous until they took you down to the hospital and gave you some sedatives, but at the time I questioned you I think you were not quite so nervous." At this conversation, defendant told the officer that insofar as the alleged burglary of Mrs. Keeney's residence was concerned he, the defendant, was "so darned drunk that he didn't remember much about it." To various other questions the defendant reiterated his claim that he had but a very hazy recollection of the events which transpired on the evening of his arrest. At the trial the defendant took the witness stand in his own behalf and testified that he had some recollection of talking to a woman in a room on the night in question but that he had no recollection as to when he entered the house nor as to what was his purpose in so doing.

Appellant first assails the judgment finding him guilty of burglary as being without support in either the evidence or the law. This challenge is grounded on the claim that the evidence as a matter of law fails to establish that at the time of the entry, or at any other time here pertinent, the defendant had or was mentally capable of forming a specific intent to steal, by reason or his aggravated state of intoxication. It is pointed out that he did not take any property or belongings from Mrs. Keeney's home; that while in the house he permitted a light to burn in the front room; that he made no effort to escape upon the approach of the home owner; and finally returned to the vicinity of the Keeney residence some thirty minutes after he had left. All these factors, argues appellant, negative the existence in his mind of the necessary and essential intent. On the other hand the record

discloses circumstances which to us furnish grounds upon which the jury could have concluded that the necessary intent was present. We refer to the method resorted to for the purpose of effecting an entrance to the house; the opened bureau drawers which were closed when Mrs. Keeney departed in the morning, coupled with the defendant's statement in answer to the arresting officer's query as to what he was doing in the house ''Well, you know as well as I do. I was trying to steal something.'' Whatever effect the wine, consumed by the defendant after he entered the house or before, may have had upon his actions while in the house and after leaving it, nevertheless we cannot say that the circumstances surrounding defendant's entry into the house are such as to amount to no evidence at all upon which the jury could predicate a finding that the essential intent was present. The authorities are legion in holding that the question of felonious intent is for the jury to decide, and may be inferred from all of the circumstances present in the case. While the circumstances alluded to by appellant undoubtedly afforded opportunity for a persuasive argument to the jury against the existence of a felonious intent, we cannot say that the determination of the jury in the instant case, that such intent was present, does violence to reason. Therefore, we cannot substitute any conclusion at which we might be tempted to arrive for that reached by the constitutional as well as statutory arbiter thereof (*People* v. *Gilbert,* 26 Cal.App.2d 1, 21 [78 P.2d 770] ; *People* v. *Perkins,* 8 Cal.2d 502, 511 [66 P.2d 631] ; *People* v. *King,* 33 Cal.App.2d 538, 542 [92 P.2d 510] ).

■ Appellant next complains of the action of the trial judge in advising the jury that if they found the defendant guilty of burglary they must determine it to be burglary of the first degree. In this connection the record discloses that after giving the jury correct instructions defining the degrees of burglary the court said: ''In this case evidence has been introduced that it was in the night time and that it was an inhabited dwelling, and therefore if you find the defendant guilty of burglary on count 1, it must be burglary of the first degree. Likewise, if you find him guilty on count 2 of the information, it must be burglary of the first degree.'' This was followed by the giving of an instruction on intent. Appellant contends that it is impossible to determine whether the court's statement was intended as an instruction to the jury that the burglary was, as a matter of law, one of the

first degree or amounted only to a comment by the court as to his opinion respecting the degree. Notwithstanding the claim of the attorney general that ''It is quite apparent that the foregoing was intended as a comment'' we are inclined to the view that it must be regarded as an instruction. Both the language used and the circumstances under which it was given endow the statement with the qualities of a direction or mandate of the court that under the evidence the offense charged ''must be burglary of the first degree.''

Furthermore, the instruction given cannot be deemed a justifiable comment by the judge ''on the evidence and the credibility of a witness'' as contemplated by the constitutional amendment (section 19, article VI, California State Constitution). The instruction did not purport to be such a comment. It amounted to a statement of the law, but in view of the evidence herein it was in reality a misstatement of the law. Nor do we think that the error in giving such an instruction was cured by the court in later admonishing the jury that ''Now, it is your exclusive problem to determine the facts of the case, and to consider the evidence for that purpose. The Court cannot determine the facts for you but may aid you in two methods: By giving you the rules of law to be used by you in arriving at the truth; by commenting upon the evidence within proper limitations.'' Nor was it cured by reading to the jury section 19, article VI of the Constitution, and further instructing them ''You will therefore, distinctly remember and ever bear in mind the fact that although during the trial I may have commented, and may in these instructions comment upon the witnesses or the evidence or both, nevertheless you at all times remain the sole and exclusive judges of the facts and the credibility of the witnesses. Any remarks I may have made or may make are intended solely to aid you in arriving at a verdict, but must not in any manner be construed as imposing my will upon you or as compelling you toward that verdict. In this connection I would caution you that it is your right and duty to exercise the same independence of judgment in weighing the judge's comments on the evidence as you are entitled to exercise in weighing the testimony of the witnesses and the arguments of counsel.''

Rather than being a comment upon the evidence or the credibility of witnesses, the declaration of the court amounted to a statement of a purely legal proposition which the jury was bound to follow, as to the degree of the burglary charged

against the defendant. It invaded the province of the jury. Without here repeating the evidence in greater detail than as heretofore narrated, it is sufficient to say that under the proven facts and circumstances there at least was possibility of a reasonable doubt as to which of the two degrees of burglary the defendant was guilty. Such being the case, he could only be convicted of the lowest of such degrees (Penal Code, section 1097.) ▮ However, if it can be said that appellant was legally and lawfully convicted of the burglary, then no miscarriage of justice resulted from the statement of the court, except that as a matter of law the jury improperly fixed the degree of the crime, and the court imposed the greater penalty therefor. That injustice may now be righted by this court without subjecting the State and the defendant to the delay and expense of a new trial (*People* v. *Kelley,* 208 Cal. 387, 393 [281 P. 609]; *People* v. *Golembiewski,* 25 Cal.App.2d 115 [76 P.2d 717]; section 1181, subdivision 6, Penal Code).

▮ It is next contended by appellant that the court committed error in neglecting to advise the jury as to the general principle and fundamental rule of law that although the information contained two counts, such fact in itself did not add to the weight of the evidence against the defendant on either count and that each count should be considered as though separately tried. The record, however, does not sustain appellant in this contention. The court advised the jury of the necessary and essential elements of the respective crimes with which he was charged and then in unequivocal language informed the jury that the defendant was charged in two counts, with two distinct offenses; that he might be convicted upon either or both counts, and that each offense of which the defendant was convicted must be stated in the verdict. In view of the instructions given, coupled with the absence of any request for a more specific admonition, we cannot assume error or hold that the jury failed to realize that the two counts in the information were to be considered by them as though separately tried.

▮ We come now to a consideration of appellant's claim that he was prejudiced by the conduct of the deputy district attorney during the latter's cross-examination of appellant. In that connection the record discloses that the prosecutor commenced his cross-examination of appellant by inquiring:

"Q. Mr. Lynch, you have been in court before, haven't you?

A. Yes sir, I have.

Q. And a good many times, haven't you?

A. Yes.

Q. Do you consider that you are familiar with court procedure? Sufficient so that you can represent yourself in this matter?

A. When I admit to having been in court quite a number of times before I don't mean to admit that I have been in court where a jury was before, or a session inasmuch as presenting my side of the case, and if I feel competent myself, so far as being adequately equipped to do so, I know that there are many other people who are much better equipped to do so.

Q. Then why didn't you avail yourself of the services of the Public Defender in this matter, and have him represent you?" When to the last question the defendant proffered an answer with which the district attorney was not satisfied, he persisted by asking:

"Q. Well why didn't you use the assistance of the Public Defender, to represent you in this case?

A. I believe that there would be several reasons, and one is that at the time that I came into court I was—I had the thought in mind that if I had someone just to apprise me about the matter in court at the time of my arraignment, and anyway there was a person, I don't know who he was, advised me to come into court and plead as I have, and for the reason, he said I should so that because in view of my record, regardless of what the principal offense is, that the law will be such that I will probably get a life sentence in the penitentiary; and the thought I had in mind is that I did not feel about this particular case about the offense that I am charged with, that I would prefer to come in to present it to the jury myself rather than have a Public Defender present it to the Court and the jury for me.

Q. And so you don't feel adequately represented in representing yourself here today, do you, that is that your knowledge of the law is sufficient for that purpose?

A. My knowledge of the law is insufficient, I recognize that.

Q. *Well, I take it that you don't have in mind here in representing yourself that you are appealing to the court for aid as you have done throughout this trial, that you wouldn't*

*by that conduct gain the sympathy of the jury,* you would have nothing like that in your purpose, would you? (Emphasis added.)

A. No, I am not concerned with sympathy.

Q. And that thought never entered your mind, did it?

A. Why, I think so far as entering my mind, yes, but not in connection with appealing to the jury or appealing to the court for instructions, no, but if I am permitted to say so, I would say that the reason I have asked the court for instruction is not to cause the jury to think anything on account of sympathy for me because I am here inadequately defending myself, but it is simply that I don't feel that I did anything wrong here.

Q. How many times have you been in court?

A. Counting the Juvenile Court?

Q. Well if you want to go back that far, yes.

A. Eight or 10 times, I believe.''

It would be an impeachment of the legal learning of counsel for the People to intimate that he did not know the aforesaid questions were improper, wholly unjustifiable, and peculiarly calculated to prejudice the substantial rights of the defendant. By such conduct a defendant is precluded from having that fair and impartial trial to which, whether innocent or guilty, he is entitled. Furthermore, it may serve to defeat the punishment of crime by jeopardizing a conviction when a defendant is clearly guilty. That the interrogatories were injected into the case for the manifest purpose of prejudicing the jury against the defendant is obvious. That the asking of such questions constituted misconduct, and of the fact that such misconduct was prejudicial, there can be little doubt. It would ignore human experience and belie the dictates of common sense to entertain a contrary view. With commendable fairness the attorney general does not attempt to justify the conduct of the prosecutor, but simply suggests that no objection was made thereto by the appellant who appeared as his own counsel. However, we think the foregoing course of conduct was so improper and so offensive to the requirement that the question of guilt or innocence shall be determined by an orderly legal procedure in which the substantive rights belonging to a defendant shall be respected, that the trial judge should have stopped the asking of such questions when the first improper interrogatory was propounded without waiting for an objection. What was said

by the Chief Justice of the U. S. Supreme Court in the case of *Vierick* v. *United States*, 318 U.S. 236 [63 S.Ct. 561, 87 L.Ed. 734], reflects our views as to the duties and obligations of a prosecuting officer. We quote: ''The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.''

Appellant next complains of the conduct of the trial judge when, during the cross-examination of Dr. K. G. Bailey, appellant inquired as to whether the witness deemed himself qualified as a psychiatrist to express an opinion as to whether a person was sane or insane at a given time prior to the date of the medical examination of such person by the psychiatrist, when such examination was made ''say a day after the thing in question is involved.'' In sustaining an objection interposed by the deputy district attorney, the court said: ''The objection will be sustained. Doctor Bailey has given a full recitation of the facts on the basis of his opinion, and in the first place I consider him qualified to make this examination and express an opinion as an expert or specialist on the subject, and as I said before the law imposes upon me the necessity of appointing specialists as I have done here in this instance, to make an examination; and furthermore, I might state for your benefit, Mr. Lynch, *as well as for the jury* that I have had occasion to appoint Doctor Bailey on a large number of cases of this kind and there has never been any challenge to his competency—'' (emphasis added).

We regard these declarations of the court as transcending the bounds of legitimate comment upon the evidence or the credibility of a witness. It amounted to an attempt upon the part of the court to testify as to the competency of the witness as an expert in his chosen line of medical practice. And it is vain to attempt to do away with the prejudicial effect of such

assertions upon the part of the court by giving the instruction provided for in section 1127(b) of the Penal Code.

It is true the jury had an opportunity to observe the demeanor and character of the witnesses and may have had reason to return the verdicts finding the defendant guilty of burglary and sane at the time of the commission of the offense, irrespective of the errors committed during the trial. As to this, of course, we can say nothing. But from the mere record, as we read it however, the errors may have turned the scale in favor of the prosecution. We do know, as heretofore noted, that the jury was led to convict the defendant of burglary of the first degree when as a matter of law he was entitled to a finding pursuant to section 1097 of the Penal Code that the offense was of the second degree. It is the bounden duty of courts to insist that a defendant be fairly convicted, because if he is not so convicted he should not be convicted at all; and to hold otherwise would be to provide ways and means for the conviction of the innocent. When a defendant is denied that fair and impartial trial guaranteed by law, such procedure amounts to a denial of due process of law (*Powell* v. *Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527]). Criminal cases should not be conducted with an eye to the saving grace of section 4½, article VI, of our state Constitution. Except in proceedings on a motion for a new trial, the constitutional section is of no concern to the trial courts, and so far as its application goes, it is of interest only to the courts of review (*People* v. *Black,* 73 Cal. App. 13, 43 [238 P. 374]).

Other assignments of error need not be considered because it is not likely that they will occur upon a retrial.

For the foregoing reasons the judgment and the order denying defendant's motion for a new trial are, and each is, reversed.

York, P. J., and Doran, J., concurred.