[Crim. No. 5308.   In Bank.   July 9, 1952.]

THE PEOPLE, Respondent, v. JOHN W. EVANS, JR., Appellant.

Popper & Burnstein, Fred B. Hart and Robert H. Kroninger for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

CARTER, J.—Defendant, John W. Evans, Jr., was convicted of a violation of section 288 of the Penal Code, and also of a violation of section 288a of the same code. The court granted a new trial on the 288a count, but denied de-

fendant's motion for a new trial on the 288 violation. A third count, charging assault with a deadly weapon was dismissed prior to trial. Judgment was suspended and defendant was placed on probation on the condition that he serve a nine months' sentence in the county jail. After hearing, it was determined that the defendant was not a sexual psychopath. The appeal is from the order denying a new trial on the conviction under section 288 of the Penal Code.

The principal contentions raised on this appeal are 'the insufficiency of the evidence so far as the element of identification is concerned and prejudicial errors alleged to have occurred during the course of the trial.

It clearly appears from the record that the complaining witness, a female child of 10½ years, was accosted and molested in an Oakland public park about 6 p. m. on a Saturday evening (August 12, 1950·) as she was leaving a swimming pool located there on her way home. According to her testimony, the man who accosted her pulled her behind a hill, disarranged her clothing and put his fingers in, and on, her private parts. She also complained that he exhibited his own sexual organs and attempted to force her to commit an unnatural act. She testified that he then drew a knife, telling her that she was to walk away and not look back or he would kill her. According to her story, the entire encounter took place in about five minutes. After leaving her assailant, the witness walked to a corner store where she first called the police who noted the time as 6:06 p. m. and then, a few minutes later, called her mother.

### IDENTIFICATION OF THE DEFENDANT

Three days after the commission of the crime, the complaining witness was shown a picture of the defendant. This picture was on the top of a pile of pictures. She remembered having seen him some time prior to the day in question but was unable to remember where, or when, she had seen him. She admitted that she could have seen him almost any place. An hour after having been shown the defendant's picture, she was taken to a room where the defendant was alone. She testified that at the time of the offense her assailant was wearing tan khaki pants with a zipper fly, a belt with the initial "W" on the buckle, and a yellow cable knit sweater with short sleeves. So far as the defendant's physical appearance was concerned, she testified that he was 5'11" tall, weighed 187 pounds, and was 21 years of age. On cross-

examination she said he could not have been 5'10" tall, or 6'0" tall, but was 5'11". (The defendant is 5'11" in height, 21 years of age, and, at the time of arrest, weighed 185 pounds.) The complaining witness testified that the man who accosted her had "goo on his hair, you know, slicked down." The record shows that the defendant owned khaki pants with a button fly, a yellow T shirt, a plain tan belt with no initial on the buckle; that he did not own, or have any reason to own, a buckle with the initial "W" thereon; that he did own a belt buckle with the initials "NMMI" (New Mexico Military Institute); that he wore no hair oil; nor did he own any. On the day in question, the defendant was wearing, together with khaki trousers and a yellow T shirt, the plain, uninitialed, web belt. He testified that the only time he wore the belt with the initials "NMMI" was when he was dressed up at school. The defendant testified that the khaki trousers and yellow T shirt was a common manner of dress in the neighborhood. This is corroborated by two witnesses who testified that they had each seen a boy, not the defendant, similarly dressed, at the time of the crime, in that neighborhood, walking rapidly away from the park. These other boys were seen at about 6:10 and 6:30 p. m.

Darlene Hatton, aged 15 years, testified that she had been swimming in the pool in the park in question, and that shortly before the time of the offense, the defendant had been outside the wire fence which enclosed the pool, a distance of approximately 16 feet, and had whistled at her. She testified that the man who whistled at her had slick, shiny hair "plastered" down, but she did not testify as to how he was dressed. She thought that it was either Thursday or Friday of the week following the offense (which had taken place on a Saturday) that the woman who owned a candy concession at the park had shown her the picture of the defendant and asked her if she had ever seen him before. A few hours after seeing the one picture—that of defendant—she was taken to a police line-up where she identified the defendant as the man whose picture she had seen and who had whistled at her the previous Saturday. She, too, testified that she had seen the defendant before the day in question "once or twice" at the Dimond Pool (the one here involved) but could not remember when she had seen him.

Defendant's brother testified that he and defense counsel, walking together, met the complaining witness and her mother

in the courthouse just prior to the commencement of the trial and the attorney, pointing to defendant's brother, asked the child if she were still ''sure that this is the man who did it,'' to which she replied that she was. At the trial the child denied having said so, but the mother admitted that the question had been asked and answered by the child, but said that the witness, Robert Evans, was not in her line of vision.

The complaining witness admitted having told the story to police officers and the prosecuting attorney about 10 times. In describing the attack on her she used the term ''private parts'' and explained that the police officers had told her to use it; at the preliminary hearing, she had used the words ''penis'' and ''vulva'' and said at the trial that she had learned the words in a book her mother had given her but she didn't remember how long before her mother had given her the book.

### DEFENDANT'S ALIBI

Defendant's story, which was corroborated by his grandmother and brother, showed that he had worked around his home, a distance of about nine or ten blocks from the park, until approximately 5:30 p. m. on that Saturday; that he then drove to the store for some groceries and there cashed a check; that he returned home at about 5:55 p. m. and was at dinner until 6:30 p. m. One of the employees of the grocery store corroborated the defendant's story that the check was cashed on the Saturday in question but did not know at what time it had been done. Defendant testified that he had been in school in New Mexico up until the first of June, 1950, and that he had remained at home from that time on. He testified that he had been in Dimond Park two or three times since his return from school; that he had not been there on the day in question; that he had been there within two or three weeks prior to August 12th.

### PREJUDICIAL ERRORS AND MISCONDUCT OCCURRING AT THE TRIAL

Three days after the crime was committed, defendant, at the telephoned request of the police, went to the police station. He testified that at the time of the call he had been working on his radio with a small 2-inch pocket knife which he put in his pocket when he left home; that when he arrived at the station, he remembered he had it with him and being afraid of having it found on his person since he did not know with what he was charged and having heard the officers mention a knife, he stuck it under the arch of his

shoe with the open blade inserted in the heel. The knife was found there by the officers who searched him. It was later returned to him and was never put in evidence by the prosecution although a witness was called to testify to the incident and it was referred to as being of the same type and description as that carried by the man who attacked the complaining witness, although no evidence was offered either describing the knife carried by him or which would indicate that the one found on defendant's person was in any way connected with the attack. The knife was referred to in both the opening statement of the prosecution and in its closing argument as being the same type of knife carried by the girl's attacker. The girl herself was unable to describe the knife.

In addition to references to the knife, one of the witnesses, Dagneau, was questioned as follows: "Well now, at the time that the police officers received the information from you as to having seen this man at approximately 6:05, or thereabouts, they asked you whether or not he was about twenty years old, tall and very strong looking; brown hair, brown eyes, dark hair on his forearms, freckles on his face, brown shoes, sun tan pants and a yellow shirt, age about 20 or 21, height about five feet eleven, weight 185." This was the exact description of the defendant who was sitting in the courtroom. There had been no direct evidence as to the freckles, dark hair on the forearms, color of the eyes, etc. The witness was then asked if this was the description of the man the police were seeking, to which he answered "Yes." The entire description was repeated a few questions later, and could only have had the effect of informing the jury that the police were looking for the defendant, and not for the girl's attacker, at the time they questioned the witness, Dagneau. The witness later testified that defendant was not the man he had seen running from the park although the man he had seen was wearing a yellow shirt of some type.

Several instances appear in the record where the prosecution asked leading questions apparently for the purpose of getting uncorroborated testimony before the jury. For example, the defendant, upon being questioned by the police, had refused to talk until after he had consulted with his father. Much stress is placed on defendant's refusal to talk until he had seen his father and one of the officers testified that when defendant was asked to confess the crime he had replied that "his father had always told him never to admit

anything.'' On cross-examination, the prosecutor was permitted to ask defendant, over objection, "Do you remember that in that same conversation with Genevesino and Brown (police officers) Genevesino said, 'John, that little girl that pointed you out last night and said you were in Dimond Park last Saturday August the 12th around six p. m. and forced her head down and made her do something to you, had you seen her *prior to that Saturday*?' And at that time, you said, 'Yes, once before, I think.' Now, didn't he ask you that question and didn't you give that answer?'' The defendant's answer was that he did not remember any such conversation. Another example of such questioning by the prosecution was one asked of the defendant, ''. . . did you tell Officer Brown in response to his request that you would *tell him the truth about where it occurred* on August 12th in the Dimond Park? Did you say that you did not want to tell the truth of what happened until you had talked with your father because your father had told you never to admit anything?'' Defendant denied having made any such statement and said that he had already told the officers the truth ''about fifty other times too.'' Another question during defendant's cross-examination was, ''Well, did they (the officers) mention the *fact* that the little girl *whom you had seen* had said *that you had a knife when you accosted her* in the Dimond Park,'' to which defendant replied that they ''might have.''

Endeavors were also made to elicit a statement from the defendant's brother that defense counsel had engaged him in an attempt to ''trick'' the complaining witness into identifying him as the defendant. When defense counsel objected, the court ruled it was proper cross-examination even though the witness twice answered that defense counsel had not so acted.

■ In none of the instances above quoted did the prosecution make any attempt to prove the truth of the matters asserted in the questions. It seems apparent that the only purpose of the form of the questions was to get the statements before the jury. Although objections were not made to all of these questions, it would appear that the case was one in which an admonition would not have purged the harmful effect of the remarks. In cases where the misconduct is of such a character that it cannot be purged of its harmful effect by an admonition, it will be considered as a possible ground for reversal where no objection was

made or admonition requested on behalf of the accused (*People* v. *Wynn*, 44 Cal.App.2d 723 [112 P.2d 979]; *People* v. *Podwys*, 6 Cal.App.2d 71 [44 P.2d 377]; *People* v. *Stafford*, 108 Cal.App. 26 [290 P. 920]; *People* v. *George*, 72 Cal. App. 124 [236 P. 934]).

## THE INFORMATION

■ The complaint against defendant charged only a violation of section 288 of the Penal Code, and he was bound over by the committing magistrate only upon that charge. The information, however, contained additional counts charging a violation of section 288a of the Penal Code and assault with a deadly weapon. Defendant contends that the court was without jurisdiction to try him on the 288a count and that reading the information to the jury must have had a highly inflammatory effect and amounted to prejudicial error. He also contends that because of the inclusion of the violation of section 288a in the information it is void. This matter was recently considered by this court in *Parks* v. *Superior Court*, 38 Cal.2d 609, 612 [241 P.2d 521], wherein it was said: "In the decisions which outline the duties of the district attorney pursuant to the foregoing provisions of the law [Cal. Const., art. I, § 8, and of the Pen. Code, § 739] there has been no departure from the proposition that the Constitution protects a person from prosecution in the absence of a prior determination by either a magistrate or a grand jury that such action is justified. The legislative history and various claimed grounds of unconstitutionality of the provisions of former section 809 (now 739) were rather extensively treated in *People* v. *Bird*, 212 Cal. 632 [300 P. 23]. The effect of the court's declarations of the constitutional operation of the section was to approve the filing of an information charging a different but related crime shown by the evidence taken before the magistrate bearing on the transaction involved in the commitment order. The court stated or plainly implied (212 Cal. at pp. 643-645) that an information would be contrary to the Constitution if it designated a crime or crimes unrelated to or unconnected with the transaction which was the basis for the commitment order." The Parks case is controlling here inasmuch as the story told by the complaining witness shows that the two crimes were related to and connected with the transaction which was the basis for the commitment order.

### Instruction on "Reasonable Doubt"

The defendant complains of the following instruction: "The defendant in a criminal case is not required to prove his innocence, but is presumed to be innocent until the contrary is proven, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal, and if the evidence can reasonably be accounted for upon a theory which would admit of a defendant's innocence, he should not be convicted." There can be no question but that this instruction is inartistically and awkwardly drawn and, in the absence of any other instruction on the subject, it would be difficult to tell what its confusing or prejudicial effect would be. In the instant case, however, following the above quoted instruction, the court told the jury that: "The effect of a presumption of innocence is only to place upon the State the burden of proving a defendant guilty beyond a reasonable doubt." This was followed by the orthodox instruction on the meaning of "reasonable doubt."

### Jurors' Affidavits

Two jurors produced affidavits that one of the jury, other than themselves, had taken a map of the city of Oakland in the jury room during the discussion of the jury. This map had not been received in evidence during the trial. The defendant contends that it was error to deny his motion for a new trial based on this evidence. The court refused to admit the affidavits in evidence, but ordered them filed. Defendant maintains that the rule declaring affidavits of jurors incompetent does not apply where they are used to show that the jury has received evidence out of court (other than a view of the premises) and that this is mentioned as a separate ground for granting a new trial in subdivision 2 of section 1181 of the Penal Code.

There is no merit in this contention since the affidavits are introduced to impeach the verdict of the jury whether they show misconduct or evidence received out of court. In *People* v. *Gidney*, 10 Cal.2d 138, 146 [73 P.2d 1186], it was expressly held that affidavits of jurors showing misconduct out of court "or evidence received by them from outside sources" have been refused admission.

This case presents an extremely close question as to the identity of the defendant. The child's testimony describing her assailant with such exactitude raises a doubt as to whether or not she had been coached in her lines.

When this ''suspect'' testimony is considered with the improper line of questioning on the part of the prosecution it may very well have led the jury to its conclusion that the defendant was guilty. Several times during the trial, the jury heard the prosecution describe the precise appearance of the defendant as he sat in the courtroom; it heard the words of police officers describing a particularly vile crime put in the form of questions to defendant in an attempt to gain from him an admission. The repetitious questions setting forth defendant's exact description could have had no other effect upon the jurors than to impress indelibly upon their minds the fact that the police had been looking for the defendant, not the unknown and unidentified man who molested the complaining witness. The statements made, in the guise of questions directed to defendant, in an effort to gain from him an admission could only have had one result, namely, that the jury would believe defendant had admitted the crime to the officers and was, on the trial, denying the truth of what he had previously said.

The repeated asking of questions relative to objectionable and prejudicial matter which involved appeals to the passions and prejudices of the jury has been held to constitute reversible error. (*People* v. *Freitas*, 34 Cal.App.2d 684 [94 P.2d 397]; *People* v. *Duvernay*, 43 Cal.App.2d 823 [111 P.2d 659]; *People* v. *Wynn*, 44 Cal.App.2d 723 [112 P.2d 979]; *People* v. *Lynch*, 60 Cal.App.2d 133 [140 P.2d 418]; *People* v. *Williams*, 104 Cal.App.2d 323 [231 P.2d 544].)

The same thing is true with respect to the references to the knife made by the prosecution. The knife found on defendant's person by the police was not in evidence and the complaining witness had been unable to describe the knife used by her assailant, yet the district attorney referred to defendant's knife as being the same type of knife carried by the girl's attacker. Statements of facts not in evidence by the prosecution in its argument to the jury has been held to constitute prejudicial misconduct. (*People* v. *Ford*, 89 Cal. App.2d 467 [200 P.2d 867]; *People* v. *Westcott*, 86 Cal.App. 298 [260 P. 901]; *People* v. *Henderson*, 4 Cal.2d 188 [48 P.2d 17]; *People* v. *Cook*, 148 Cal. 334 [83 P. 43].)

In a case such as this where the crime charged is of itself sufficient to inflame the mind of the average person, it is required that there be rigorous insistence upon observance of the rules of the admission of evidence and conduct of the trial. (*People* v. *Adams*, 14 Cal.2d 154, 167 [93 P.2d 146];

*People* v. *Putnam,* 20 Cal.2d 885, 888 [129 P.2d 367]; *People* v. *Byrd,* 88 Cal.App.2d 188, 190 [198 P.2d 561]). It appears to us that even more care should be taken to protect the rights of the accused where the evidence as to the identity of the defendant leads one to conclude that a child of the age of the complaining witness, under the circumstance prevailing, would not have been able to describe her attacker so precisely. As was said in *People* v. *Adams, supra*: "Errors committed either by the prosecution or by the court in the course of a trial, which ordinarily might be considered trivial and as of no material consequence from a standpoint of adverse effect upon the rights of a defendant, may become of great importance when committed in a case of the character here involved."

The only evidence presented as to the identity of the girl's assailant is the testimony of the complaining witness. While her testimony is not so inherently improbable as to be worthy of no belief, it is open to attack on the ground that it shows that she had been suggestively questioned and re-questioned as to the crime by the police. In connection therewith, it can hardly be said to be in accord with principles of justice and fair play to show a complaining witness the picture of one man and then take her into a room where that man is the only occupant.

It must be concluded that where, as here, the case is one involving a crime of such an inflammatory character and the evidence on the issue of identity so closely balanced, the errors set forth could not have had any other effect upon the jury than to tip the scales against the accused.

The order denying a new trial is reversed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Respondent's petition for a rehearing was denied August 7, 1952.