[Crim. No. 3667. First Dist., Div. Two. Feb. 25, 1960.]

THE PEOPLE, Respondent, v. BOOKER T. JOHNSON, Appellant.

Martin N. Pulich and George Nye, Public Defenders (Alameda), John D. Nunes and H. Reed Searle, Assistant Public Defenders, for Appellant.

Stanley Mosk, Attorney General, and Peter T. Kennedy, Deputy Attorney General, for Respondent.

KAUFMAN, P. J.—Appellant was charged by information with murder. He entered a plea of not guilty and not guilty by reason of insanity. On December 13, 1958, a jury found him guilty of murder in the first degree. Thereafter, on December 18, trial was had on the issue of appellant's sanity. The jury found that the appellant was sane at the time of the commission of the offense and he was sentenced to the state prison for life. On appeal from the judgment and the order denying his motion for a new trial, he argues that the district attorney committed prejudicial misconduct in the cross-examination of a character witness and in the closing argument to the jury during the sanity phase of the trial.

The facts as revealed by the record are as follows: The appellant, who was then 50 years old and regularly employed,

lived in the front room on the second floor of an apartment house at 671-5th Street in Oakland. Along with his room, the appellant had kitchen privileges to obtain hot water and use the sink in the kitchen of the apartment adjoining his. The appellant had to pass the door of this apartment on his way to and from the common bathroom and the stairway, both of which were located further down the hall.

On February 9, 1956, Mrs. Daisy Walker and her four children moved into the apartment next door to the appellant's room. For a period of time after Mrs. Walker moved in, she and the appellant maintained an intimate relationship. During this time, the appellant contributed to the support of Mrs. Walker and her children. The appellant testified that their relationship lasted for about one year, until January, 1957, when Mrs. Walker terminated it because he was too old for her. Mrs. Walker testified that she terminated the relationship after about six months because of the appellant's jealousy. He walked up and down in front of her room whenever she had visitors and asked the children who the visitors were and what they wanted. However, the appellant continued to use Mrs. Walker's kitchen, was very friendly and affectionate toward the children and contributed funds toward Mrs. Walker's support. He also continued to inquire about her visitors.

In November, 1957, Mrs. Walker met one Nathaniel Rose, the victim. They became friends and he frequently baby-sat with her children, sometimes as often as three times a week. On one such occasion, early in January, the appellant invited Rose to his apartment. They drank some wine and had a pleasant conversation. Thereafter, their contacts were less cordial. In the further course of the victim's going and coming from Mrs. Walker's apartment, the victim and appellant got into a number of altercations that resulted in ill feeling between the two men. In the latter part of February, 1958, Rose left the outer door of the apartment house unlocked. The appellant locked it. When Rose returned, the appellant would not open the door for him. After one of the Walker children opened the door for Rose, the appellant threatened Rose with a knife handle.

On the evening of March 5, 1958, Rose was baby-sitting in Mrs. Walker's apartment while she went to church. She had left him with the children about 6:30 p.m and did not return until about 9:30 p.m. As she walked down the

stairs, she noticed the appellant standing in the doorway to his room. About 7 p. m. that evening, Robert (nicknamed "Straight Eight") Williams joined the victim to watch television in the living room or middle bedroom of the Walker apartment. When Mr. Williams arrived, Mr. Rose got up from the couch, turned on the television set. About 10 or 15 minutes later, the appellant burst into the room shouting "Get out of the way, Straight Eight. I'm going to kill Rose. I don't want to kill you." At the same time, appellant shot Rose several times. Mr. Williams ran into the bathroom and locked himself in until the police arrived.

The appellant returned to his room, left the gun on the bed and went to the apartment below to call the police. The tenant there would not allow him to use the 'phone so he went to the apartment of Mr. Scaera, the manager, at 677-5th Street. The appellant told Mr. Scaera that he wanted to use the telephone to call the police because he had killed a man. He showed Mr. Scaera his pistol, an empty "eight shooter." The appellant and Mr. Scaera returned to the Walker apartment and saw Rose's body. Mr. Scaera returned to his house to call the police while the appellant called the police from Mrs. Walker's 'phone.

A police officer arrived and found an empty .22 caliber revolver on appellant's bed and the body of Rose in the living room or middle bedroom of the Walker apartment. There were bullet holes in the window by the couch and in the door of the living room. A bullet was found on the floor near the television set. Then appellant told the officer he had shot the victim.

The cause of death of the victim was established as multiple gunshot wounds. The autopsy revealed an alcoholic level of .32 per cent in the deceased's blood, which would indicate a considerable consumption of alcohol, but Mrs. Walker and Mr. Williams testified the victim had not given any signs of intoxication on that evening. The eyewitness, Mr. Williams, testified the victim had not had any conversation with the appellant that evening before the shooting.

The appellant testified that on February 13, 1958, he had bought a .22 pistol to protect himself from prowlers, and that he often carried the gun with him on his way to and from the bathroom. He loaded the gun when he purchased it and it remained fully loaded thereafter. The appellant further testified that on March 2, 1958, Rose had come to

his door and told him that Mrs. Walker had redeemed her husband's pistol from the pawn shop and that Rose was still very angry with the appellant because of the door incident. Appellant thought these words constituted a warning or threat. Appellant further testified that on the afternoon of the shooting, Mrs. Walker's oldest daughter, Rudell (who was then 5 years old), told him that Rose had her daddy's gun and was going to tear him to pieces. At the trial Rudell denied this statement.

The appellant testified that several times he overheard Rose making threatening remarks about him and that on two occasions Rose had blocked his way on the stairs and outside. The evening of the shooting, Rose took appellant's copy of the evening paper and hid it from him. Aside from appellant's testimony, there is no evidence to corroborate these two incidents. Mrs. Walker's testimony, however, corroborated appellant's testimony about the shotgun in her kitchen closet.

Appellant testified that on the evening of March 5, he returned to his room after work about 4 p. m. He then cashed his pay check, paid his rent, talked to some friends, including Mr. Williams, and then went to a café where he ate a sandwich and drank two beers. When he returned to his room, the Walker children came to see him. He walked past Mrs. Walker's living room and saw the victim sitting on the couch watching television with Robert (Straight Eight) Williams but said nothing to either one. The appellant started walking down the hall from his room towards the bathroom, and as he passed Mrs. Walker's living room, he saw the victim walking toward the kitchen and thought that Rose was going to get the shotgun which Mrs. Walker kept in the kitchen closet. Appellant returned to his room and got his pistol which he put in his rear pants pocket. The appellant then went to the bathroom where he remained 5 or 10 minutes. When he left the bathroom, he saw the victim standing in the hallway between the appellant's door and Mrs. Walker's door, blocking the appellant's way. Appellant stopped and waited, attempting to decide whether he should wait and speak to Rose or turn and go down the stairs. The appellant asked Rose to move out of the way and let him pass. Suddenly, Rose made a jump at the appellant and moved his hand toward his pocket to what the appellant thought was a gun. Appellant thought Rose was

lunging at him, drew his pistol and fired several shots in self-defense. Rose wheeled into Mrs. Walker's living room. Appellant entered and saw Mr. Williams going into the bathroom and told Mr. Williams to wait until the police came, then returned to his room, told the children to remain there, and went downstairs to call the police. He waited for them to arrive and made no attempt to flee or resist.

The first alleged prejudicial misconduct of the prosecuting attorney occurred during the cross-examination of the appellant's character witness, Mrs. Campbell. On direct examination, Mrs. Campbell testified that she had known the appellant since 1952, and that his general reputation in the community for peace and quiet was good. The district attorney opened the cross-examination with the following question:

"By Mr. Martin: Q. Mrs. Campbell, without taking too much of your time up, would your opinion be the same if you had heard that the defendant was involved in another shooting with another woman some 10 or 15 years ago?"

Appellant's counsel objected and was sustained. The district attorney reframed the question thus:

"Mr. Martin: Q. Have you heard that the defendant was involved in a shooting some 15 years ago with a woman?"

Appellant's counsel objected on the ground of remoteness and was overruled and told by the court:

"The Court: The second objection is overruled. The first one—there is no duty on the part of the District Attorney to call such character witnesses. You know the grounds upon which you may challenge his question, Mr. Nunes. If you wish to do that it should be done out of the presence of the Jury."

Appellant's counsel changed the ground of his objection to the good faith of the prosecution. At the hearing in chambers, the district attorney stated that the question was based on the following statement in a medical report made at the trial: "In 1935 when a girl friend who was playing with a gun accidentally shot him in the leg." The court then ruled that the question was improper because it was asked without factual foundation. The court then admonished the jury and denied appellant's motion for a mistrial.

Appellant first argues that the mere asking of the question showed bad faith on the part of the prosecution and that, therefore, the court should have granted his motion for a

new trial, citing *People* v. *Buchel,* 141 Cal.App.2d 91 [296 P.2d 113] ; *People* v. *Williams,* 104 Cal.App.2d 323 [231 P.2d 544] ; *People* v. *Wells,* 100 Cal. 459 [34 P. 1078]. In *People* v. *Buchel, supra,* the defendant was convicted of violating section 288 of the Penal Code. After two of his character witnesses had testified that his reputation for chastity was good, the district attorney, over objections, was allowed to ask each of them if they had heard the defendant accused of immoral conduct with his daughters, and whether, if they had heard of it, it would affect their opinion. The court quoting from *People* v. *McKenna,* 11 Cal.2d 327, said at pages 335-336 [79 P.2d 1065] :

". . . In the absence of a showing of bad faith it is always within the scope of legitimate cross-examination to ask a character witness whether he has heard the person whose reputation is under investigation accused of conduct inconsistent with the character attributed to him by the witness. (*People* v. *Stevens,* 5 Cal.2d 92, 99 [53 P.2d 133].) The court properly allowed the questions asked by the district attorney," and then pointed out that such questions should not be asked of a defense character witness unless the prosecution intends to call character witnesses in rebuttal to testify as to the bad reputation of the defendant as to the traits involved. Appellant here argues that since the prosecution called no rebuttal character witnesses, the asking of the question showed bad faith. On the facts of the instant case, we cannot agree. It must also be pointed out that the court in the Buchel case at page 97 indicated that the most serious error which led to the reversal of the judgment was the admission into evidence of the testimony of the defendant's two daughters that he had committed acts of a sexual nature upon them.

In the Williams case, the defendant was convicted of robbery in the first degree. The evidence was sharply conflicting. The judgment of conviction was reversed on appeal because the district attorney attempted to elicit from the defendant's relatives, called as prosecution witnesses, their asserted previous statements, admittedly hearsay, and implied in his argument that the defendant did not call these witnesses because of the damaging effect of the statements.

In the Wells case, *supra,* the defendant was convicted of forgery, as he had been effectual in obtaining a loan for one Miss Hutchings who falsely impersonated a Miss Dick who was the owner of certain real property in San Francisco.

His defense was that he, like the others, had been deceived and had believed Miss Hutchings to be Miss Dick. After the forgery had been discovered, the defendant Wells made considerable effort to find Miss Hutchings, and employed one Staniels (among others) for this purpose. Staniels testified for the prosecution. Subsequently, another witness for the prosecution was asked on cross-examination:

" ' . . . I want to ask one leading question, and do not answer it until counsel has an opportunity to object. Is it a fact that a short time after that Staniels came to you and reported about Wells wanting him to tell the woman to skip?' . . . "

On appeal, the Supreme Court said at page 461: " . . . There was not the slightest excuse for asking this question. In fact, there was injected into it an apology for asking it. What, then, was its purpose? Clearly, to take an unfair advantage of appellant by intimating to the jury something that was either not true, or not capable of being proven in the manner attempted. And the wrong was not remedied because the court sustained an objection to the question. Counsel undoubtedly knew beforehand that the objection would be sustained."

Appellant valiantly argues in his brief that the above is equally applicable here. After a careful perusal of the rather lengthy record, we cannot agree. The trial lasted for 15 days and we do not think the prosecution was conducted in the reprehensible manner of the Wells case.

Appellant argues that the asking of the question was prejudicial error which could not be cured by the court's subsequent admonition to the jury to wipe the question from their minds and disregard any inferences arising from it. He relies on *People* v. *Ford,* 89 Cal.App.2d 467 [200 P.2d 867]; *People* v. *Derwae,* 155 Cal. 592 [102 P. 266]. The applicable rules have been well summarized in *People* v. *Ford, supra,* at pages 470-471:

"Upon the other hand, where the misconduct is of such a character that it cannot be purged of its harmful effect by an admonition, it will be considered as a possible ground for reversal in cases where the jury has been admonished (*People* v. *Braun,* 14 Cal.2d 1, 8 [92 P.2d 402]; *People* v. *Derwae,* 155 Cal. 592, 597 [102 P. 266]; *People* v. *Hidalgo,* 78 Cal.App.2d 926, 948-949 [179 P.2d 102]; *People* v. *Duvernay,* 43 Cal.App. 2d 823, 828 [111 P.2d 659]; *People* v. *Edgar,* 34 Cal.App. 459,

471 [167 P. 891]), as well as in cases where no objection was made or admonition requested on behalf of the accused (*People* v. *Wynn,* 44 Cal.App.2d 723, 732 [112 P.2d 979]; *People* v. *Podwys,* 6 Cal.App.2d 71, 76 [44 P.2d 377]; *People* v. *Stafford,* 108 Cal.App. 26, 29 [290 P. 920]; *People* v. *Simon,* 80 Cal.App. 675, 679 [252 P. 758]; *People* v. *George,* 72 Cal.App. 124, 131 [236 P. 934]). In either situation, where the case is closely balanced and guilt has not been so clearly established as to render it improbable that the harmful effect of the misconduct may have turned the scales against the accused, such misconduct has consistently been deemed ground for reversal. (*People* v. *Hale,* 82 Cal.App.2d 827, 834 [187 P.2d 121]; see also *People* v. *Lynch,* 60 Cal.App.2d 133, 145 [140 P.2d 418]; *People* v. *Fleming,* 166 Cal. 357, 381 [136 P. 291, Ann.Cas. 1915B, 881]; *People* v. *Angelopoulos,* 30 Cal.App.2d 538, 549 [86 P.2d 873].)''

We do not think that the instant case is in this category. In the Ford case, there was only slight circumstantial evidence of the defendant's guilt apart from his confession. In the other cases cited therein, the evidence was also closely balanced. The same is true of *People* v. *Evans,* 39 Cal.2d 242 [246 P.2d 636], also cited by the appellant. In the instant case, the evidence against the appellant is overwhelming and uncontroverted and appellant's guilt clearly established.

Appellant, however, argues that precisely for this reason the reference to the prior shooting incident which inferred that the appellant was the aggressor when in fact, he was the victim, was incurably prejudicial, as it kept the jury from considering appellant's defense that at the time of the shooting he thought himself threatened and did not have the necessary malice aforethought. *People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53], relied upon by the appellant, held that the exclusion of evidence of medical experts to show that the defendant did not act with malice aforethought, although erroneous, was not prejudicial error. In the instant case, expert evidence about the appellant's mental ability to form the specific intent required was admitted.

As pointed out above, the appellant fully admitted that he shot the victim. The only conflict in the evidence was whether the shooting took place in the manner described by the eyewitness or in the manner described by the appellant. This was a question of fact for the jury and the sufficiency of the evidence is admittedly not in issue on this appeal. It should also be noted that appellant's own witness, Dr. Due, fully

explained the earlier shooting incident which was the subject of the district attorney's question here in issue. While we cannot condone the asking of the question here, which was clearly error, we do not think that under the circumstances of this case, it can be said that the error was prejudicial. We think the error was cured by the court's prompt admonition to the jury and the subsequent explanation by appellant's witness. (*People* v. *Walters,* 165 Cal.App.2d 326 [331 P.2d 1037].)

Appellant's second major argument on appeal is that the district attorney committed prejudicial misconduct in his argument to the jury during the insanity phase of the trial. During this phase of the trial, all the prior evidence was admitted by stipulation, except the substantive testimony of Doctors Due and Rapaport which related to the appellant's ability to form the requisite specific intent. The prosecution initially relied on the presumption of sanity. The appellant presented four psychiatrists, all of whom testified that the appellant was legally insane at the time of the shooting. In rebuttal, the prosecution called two psychiatrists who testified that the appellant was legally sane at that time. No further evidence on the matter of appellant's mental state was introduced.

During his closing argument to the jury, the district attorney stated:

" '*So what we have to fall back on is the law.* The law that we must follow, the law that says the defendant must prove that he is insane by a preponderance of the evidence; and he must go forward and show this. The law says that the defendant is presumed to be sane. Now, if this were not true, and if just on the testimony here, and I submit it is certainly far from conclusive, but if on this testimony alone, if all the defendant has to do is say that "this man threatened me," of course, that would be a self-defense argument and "he was in my way" and the People come along and they show that there weren't any threats, and then he, in June on an NGI, he has people examine him and they say, "Well, there were no threats, this must be a hallucination." '*And, boom! he is found not guilty of a murder in the first degree by reason of this claim, that a "man threatened me" and nobody can show that there were any threats, so the man walks free and clear of this charge.*' "

Appellant's counsel immediately objected and the court admonished the jury to disregard all comments relating to the

disposition of the case and asked the district attorney not to refer to it again.

Appellant argues that these remarks constituted intentional and deliberate misconduct designed to lead the jury to believe that if the appellant were found legally insane, he would be released from custody. He relies on *People* v. *Mallette,* 39 Cal. App.2d 294 [102 P.2d 1084]. In that case, a conviction of murder in the first degree was reversed because of the trial court's comment on the defendant's prior commitment and because the district attorney in his closing argument to the jury said:

" ' . . . A plea of not guilty by reason of insanity is equally a trial of the case, because if the defendant should be found insane at the time of the commission of the offense that is a finding that she is not guilty of the crime, because it is a theory of our law that an insane person can not commit a crime, so the crime requires the operation of a sane mind, and therefore she will walk out free if you find she was insane at the time of the commission of the offense.' "

The court said at pages 299-300: ". . . These remarks were wholly out of place and their effect could not be cured by the subsequent order of the court in striking them. The jury had just convicted her of murder. After said remarks, they could not but have reasoned that if they found her insane they would turn loose upon the community a dangerous person capable of doing much mischief. The statement appealed to a deeply rooted sentiment and could not be erased by any admonition of the court. The instinctive reaction of a socially minded person to the picture of her 'walking out a free woman' is too well understood to require further elucidation. Moreover, after the remarks of the district attorney had left before the jury a vision of the defendant at large in society, the court declined to explain to the jury that a finding of insanity would require defendant to be confined in the state hospital for the criminally insane in accordance with the provisions of section 1026 of the Penal Code. This, he should have done, in view of the remarks of the district attorney."

Appellant argues that the above is equally applicable here, as the court in the instant case did not explain the effect of a finding of insanity to the jury. I cannot agree. Whether a prosecutor has been guilty of prejudicial misconduct must be determined in the light of the particular factual situation involved. In *People* v. *Mallette,* the main ground of reversal was because of the trial court's erroneous comments to the jury.

This error is not present in the instant case. *People* v. *Morlock*, 46 Cal.2d 141 [292 P.2d 897], is relevant here. In that case, as in this one, the defendant was accused of murder and entered a plea of not guilty and not guilty by reason of insanity. A jury found him guilty as charged and sane at time of the commission of the offenses and the death penalty was imposed. On appeal, the defendant argued that the district attorney was guilty of prejudicial misconduct in his *voir dire* examination because he told the jury that a life sentence meant that the defendant would be eligible for parole within seven years. The Supreme Court said at page 148:

". . . We are of the opinion that under the evidence here it is not possible that defendant could have been prejudiced by the erroneous statement. We do not, however, condone such conduct on the part of the People. It is obvious that there is no segment of the legal profession more familiar, or who should be more familiar, with the criminal law than that which engages in the prosecution of criminal cases, and it can hardly be said that a statement of the character made by the prosecution in this case was the result of mere inadvertence. If this were a case where proof of guilt was questionable, we would be disposed to hold that such a statement constituted prejudicial misconduct and justified a reversal. Upon the record before us, however, we are disposed to hold that the misconduct was not prejudicial to defendant and that a miscarriage of justice did not result therefrom (Cal. Const., art. VI, § 4½)."

Recently, the Supreme Court upheld in this state that an argument or even an instruction to the effect that a life sentence if imposed, actually meant a lesser term. (*People* v. *Jones*, 52 Cal.2d 636, 650 [343 P.2d 577]; *People* v. *Chessman*, 52 Cal.2d 467, 495-496 [341 P.2d 679].)

I do not think the argument complained of was prejudicial here and that the trial court's admonition to the jury cured any prejudice.

In view of the foregoing, I would affirm the judgment of conviction and order denying the motion for new trial.

DRAPER, J.— I agree that the error in trial of the issues raised by the plea of not guilty was not prejudicial, and concur in the affirmance of the judgment as to that phase of the case.

 I disagree, however, as to the effect of the misconduct of the deputy district attorney in his argument to the jury

on the issue joined upon defendant's plea of not guilty by reason of insanity.

Closely comparable argument has been held to constitute prejudicial misconduct. (*People* v. *Mallette,* 39 Cal.App.2d 294 [102 P.2d 1084].) I cannot escape the reasoning of that court that a jury which has just convicted a defendant of murder will be strongly inclined against loosing upon the community one whom they themselves have thus stamped a menace to society. Of course, the argument misstated the law. A defendant found not guilty by reason of insanity is to be confined in a state hospital for the criminally insane unless and until he is determined to have fully recovered his sanity. (Pen. Code, § 1026.)

Under these circumstances, the admonition of the trial court was inadequate to remove the prejudice. The jury was told that "what would happen under the condition" outlined by the prosecutor "is no concern of yours," and that the jurors "must absolutely erase any reference to any disposition from your minds." The inaccuracy of the prosecutor's statement of the legal consequences of a verdict for defendant lends weight to the statement in *Mallette* that an effective cure could be given only by an instruction upon the true effect of such a verdict. No such instruction was given here.

█ I cannot accept the argument of the prosecution that because the evidence on the not guilty plea is strongly against defendant, misconduct in the insanity phase of the trial is not prejudicial. This amounts to arguing that all guilty defendants are sane, a non sequitur which would effectively eliminate the clear legislative mandate for trial on the plea of not guilty by reason of insanity. █ Similarly unimpressive is the contention that the issue of sanity had been disposed of in the first phase of the trial, when the jury impliedly found against defendant's claim that his mental condition was such as to render him incapable of premeditation. This defense has been held to be distinct from the issue raised by the plea of not guilty by reason of insanity. (*People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53].) To accept the prosecution's argument would be to negate this distinction and to deny effective trial of the insanity issue when the claim of inability to premeditate had been asserted in the first phase of the trial.

In view of the highly conflicting evidence as to defendant's sanity, the prosecutor's misconduct appears to me to be prejudicial, and thus beyond the healing powers of section 4½ of article VI of the Constitution.

The judgment on the plea of not guilty is affirmed. As to the plea of not guilty by reason of insanity, the judgment is reversed and the cause remanded for new trial of the issues raised by that plea.

DOOLING, J.—I concur in the opinion of Mr. Justice Draper.