[Crim. No. 1787.   First Appellate District, Division Two.—August 17, 1934.]

THE PEOPLE, Respondent, v. V. L. COFFELT, Appellant.

Leo A. Sullivan and John G. Robertson for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

SPENCE, J.—Defendants V. L. Coffelt and G. R. Searl were jointly indicted, tried and convicted on the charge of grand theft. Defendant Searl has not appealed, but defendant Coffelt has appealed from the judgment of conviction and the order denying his motion for a new trial.

The charge was tried upon the theory that a conspiracy existed between the defendants for the purpose of obtaining money and property from the public in exchange for stock of the Lusitania Corporation upon false and fraudulent representations and that the property of the complaining witness, Mrs. Clara M. Thornton, was unlawfully taken in pursuance of such conspiracy. The transcript is very voluminous, containing almost 2,000 pages, and it appears that over 150 exhibits were offered at the trial. We believe, however, that the essential facts for the purposes of this opinion may be briefly stated.

Mrs. Thornton owned a piece of land in Concord consisting of about three acres. She had authorized her agent Adams to sell this property. Adams was approached by defendants with a proposition for the purchase thereof. After certain negotiations, in which the purchase price of $3,000 was practically agreed upon as a basis for the deal, Mrs. Thornton finally exchanged her property for the sum of $500 and 125 shares of the preferred stock of the Lusitania Corporation. Mrs. Thornton previously knew nothing of said corporation and relied upon written and

oral statements given and made to her through her agent. Among the oral representations made by defendant Searl to said agent and communicated by him to Mrs. Thornton were the following: "That they had the Lusitania building in which they were . . . ; that they also owned the Pittsburg Building and Loan Association and that they owned the Victory Mutual Life Insurance Company and that they had the office of the Pittsburg Building and Loan Company at Pittsburg as a part of their assets"; that "the income from the Victory Mutual was approximately a thousand dollars a month"; "that the Lusitania building had a very good class of tenants and they were paying good rental prices and the property was considered a very valuable piece of property"; that the University of California was "one of their tenants occupying a group of offices there in that building"; that the "Lusitania Company was taking in quite large amounts of money" and "that it was a good, profitable concern". These and other representations which were made for the purpose of inducing Mrs. Thornton to part with her property were shown to be false and fraudulent.

As above stated, the oral representations in the Thornton transaction were made by defendant Searl. We do not believe that appellant seriously questions the sufficiency of the evidence to sustain the conviction of his co-defendant Searl, but appellant does contend that there is no evidence connecting him with the crime charged. In our opinion this contention is without merit. There is abundant indirect evidence in the record to sustain the implied finding that an unlawful conspiracy existed between appellant and his co-defendant Searl and that the representations made by defendant Searl in the Thornton transaction were made pursuant to and in furtherance of the objects of such conspiracy. It may be here noted that the jury was fully and fairly instructed on the subject of conspiracy and that no exception is taken upon this appeal to the giving of any of said instructions.

We will summarize briefly some of the evidence relied upon to establish the conspiracy between the defendants Searl and Coffelt. Coffelt acquired for a nominal sum the charter of an inactive assessment mutual life insurance association known as the Victory Mutual Life Insurance

Association. In promoting this venture he conceived the idea of operating a building and loan association in conjunction therewith in order that the dues and assessments of the members of the life insurance association might be deducted from said members' deposits in the building and loan association. Coffelt met with Searl and after the lapse of some time they finally acquired through certain fictitious transactions the charter of a practically dormant building and loan association known as the Pittsburg Building and Loan Association. Their scheme contemplated the incorporation of a holding company to be known as the Lusitania Corporation and the sale of the stock thereof. Said corporation was organized by defendants in Nevada and after considerable effort involving false representations by defendants to the commissioner of corporations of this state, they ultimately obtained a permit to sell said stock. Defendants then launched upon an intensive sales campaign with defendant Coffelt acting as sales manager. This campaign was directed largely to selling the stock to the Portuguese people in Alameda County and at the same time a concerted effort was made to obtain depositors in the building and loan association. The name Lusitania was adopted because of its strong appeal to the Portuguese people. In order to impress the prospects with the magnitude of the plan, defendants published pamphlets stating that the corporation was "organized to own, operate and manage financial institutions and their affiliated companies, building and loan association companies, insurance companies, banking companies and mortgage companies operated on the Pacific Coast and in the states of California, Oregon, Washington and Nevada". In the campaign Coffelt hired the salesmen and gave them their instructions. He arranged for extensive radio broadcasting and newspaper advertising to supplement the work of said salesmen. The radio and newspaper advertising was done in the Portuguese language, but the evidence showed that the material for this advertising was either written or approved by defendant Coffelt. Much of this material was false and was similar in its nature to the false representations made in the Thornton transaction. It appears that Coffelt as sales manager in talking to his salesmen stated as follows: "You fellows are not delivering. You have got to bring in the money. These

Portuguese people have money, they have it under their mattresses and in cans. It is up to you fellows to bring it in. If people can't swim, let them sink. Bring in the money. I don't care how you get it, but bring it in." The campaign continued over several months before and after the Thornton transaction and although a large amount of stock was sold and a large amount of deposits were obtained for the building and loan association, the whole structure finally collapsed and the Lusitania Corporation was found to be hopelessly insolvent. · It would serve no useful purpose to set forth in detail the entire history of the working out of the scheme of these defendants. They were in active control of the sales campaign and of the management of the Lusitania Corporation and the building and loan association. Suffice it to state that the record is replete with false and fraudulent representations made by them and their agents in said sales campaign and shows that they caused many fictitious or dummy transactions to be put through the books of the corporation and the association. This evidence amply sustains the implied finding of the existence of an unlawful conspiracy between said defendants and the implied finding of the taking of the property of Mrs. Thornton in pursuance thereof. While there is no evidence that appellant Coffelt personally made any of the fraudulent representations to Mrs. Thornton, it is significant to note that he was present when the purchase of her property was first discussed with her agent and that he arranged the fictitious transaction whereby it was made to appear that the stock which Mrs. Thornton received for her real property was being sold for cash as required by the permit from the corporation commissioner.

Appellant further contends that nothing of value was received by him from the Thornton transaction. Perhaps the record fails to show that appellant personally profited directly by the Thornton deal. At the suggestion of appellant the stock certificate was made out in favor of one Rose, a salesman in the stock selling campaign. The Thorntons were requested to make out the deed to one Jack Frietas who had been acting as Portuguese interpreter for one of the salesmen. The deed was so made out and Frietas then signed certain papers concerning which he knew nothing but which were in fact an application for a loan from the Pitts-

burg Building and Loan Association, a promissory note in favor of said association for $5,400 and a deed of trust covering the Thornton property. There was much conflict in the statements subsequently made by the defendants regarding this transaction. In appellant's brief it is stated that out of the $5,400 loan, $500 went into escrow for the cash payment to the Thorntons, that $2,500 went to the Lusitania Corporation as the purchase price of the stock received by Mrs. Thornton by indorsement of the certificate issued to Rose, that $2,000 went to one Eyre who was in charge of the "building program for the Lusitania" to pay off certain overdrafts and that $400 was retained by the Pittsburg Building and Loan Association to cover costs in the transaction. It appears that Rose and Frietas merely acted as dummies in consummating this deal. The fact, if it be a fact, that appellant may not have received the property or the proceeds of the loan, directly or indirectly, is wholly immaterial. We must assume in discussing this contention that the property of Mrs. Thornton was obtained from her by the false pretenses of the defendants and under these circumstances it was not necessary to show that the property was obtained by the defendants themselves, but it was sufficient to show that, induced by such false pretenses, the complaining witness delivered the property to a third party. (*People* v. *Woods,* 59 Cal. App. 740 [212 Pac. 41] ; 25 C. J. 606.)

Appellant further contends that there is no evidence to show that Mrs. Thornton was induced to sell her property in reliance upon any false representation of a material fact. Under this heading appellant deals only with the false representation regarding the ownership of the Lusitania building and claims that "it is inherently improbable that the Thornton transaction was predicated" upon said representation. Appellant's argument ignores the other numerous false representations regarding the assets, income and financial prosperity of the corporation. These were all representations of material facts and there was ample evidence to sustain the jury's implied finding that Mrs. Thornton parted with her property in reliance thereon.

The remaining contentions of appellant all relate to the admission of evidence not directly connected with the Thornton transaction. Appellant refers to the testimony

concerning false statements made over the radio and in the newspapers which statements were made in the Portuguese language and were neither heard by nor communicated to Mrs. Thornton or her agent. He also refers to evidence of other transactions occurring after the Thornton transaction had been completed. He also claims that evidence was admitted regarding transactions which were not similar in character to the Thornton transaction. While appellant concedes that it is proper to admit evidence of similar offenses in certain cases, he contends that none of the elements justifying such procedure are present in the instant case. In our opinion there was no prejudicial error in admitting the testimony to which appellant has called our attention. The prosecution sought by indirect evidence to prove that the defendants had entered into an unlawful conspiracy for the purpose of defrauding the public by false pretenses in the sale of the stock in the Lusitania Corporation. In order to show the plan or scheme, to establish the guilty intent and to prove that an unlawful conspiracy existed between said defendants, the evidence complained of was properly admitted. (*People* v. *Shurtleff*, 113 Cal. App. 739 [299 Pac. 92]; *People* v. *Collier*, 111 Cal. App. 215 [295 Pac. 898]; *People* v. *Cordish*, 110 Cal. App. 486 [294 Pac. 456]; *People* v. *Robinson*, 107 Cal. App. 211 [290 Pac. 470]; *People* v. *Sampsell*, 104 Cal. App. 431 [286 Pac. 434]; *People* v. *Whiteside*, 58 Cal. App. 33 [208 Pac. 132]; 8 Cal. Jur. 69; 5 Cal. Jur. 521.) While much of said testimony involved representations made in a foreign language to other persons and while other transactions were shown, some of which were similar and others not similar to the Thornton transaction, we believe that all of said testimony was admissible as tending to show a general plan or scheme to defraud the public by means of false representations and as tending to show that an unlawful conspiracy existed between the defendants for that purpose.

The judgment and order denying a new trial are affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 13, 1934.