[Crim. No. 6274.   Second Dist., Div. One.   Jan. 5, 1959.]

THE PEOPLE, Respondent, v. ELLIS O. BARBER, Appellant.

K. E. Nungesser for Appellant.

Edmund G. Brown, Attorney General, and Arthur C. De Goede, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from the order granting probation to the defendant upon charges of grand theft.

In an information filed in Los Angeles county on February 18, 1957, the defendant was charged in four counts (I, III, V and VII) with the crime of violating section 26104(a), Corporations Code, and in three counts (II, IV and VI) with the crime of grand theft (Pen. Code, § 487, subd. 1). The defendant was found not guilty of the charges under the Corporations Code, and guilty of the grand theft charges.

Counts II and IV charged the defendant with taking $500 of the personal property of George McLain, Sr., on or about the days of March 30, 1954 and June 14, 1954, respectively. In count VI the defendant was charged with taking $500 from Richard E. Harvuot on or about July 24, 1954. The information further set forth that the defendant was out of the state of California and not within it for the period from October, 1956 to February 4, 1957, and that he had previously been convicted of the crimes of violation of the Corporate Securities Act and grand theft.

It was stipulated that the cause might be submitted upon the transcript of the preliminary hearing, each side reserving the right to offer additional evidence. The defendant was found guilty as heretofore mentioned, and probation was granted for three years on conditions, among others, that the

defendant make restitution and pay fines of $1,000 each on counts II and IV.

A résumé of the facts is as follows: H. B. Turner and the defendant agreed in February, 1952, to form the Death Valley Panamint Mining Company, a corporation, hereinafter referred to as the company. Turner and his partners owned 26 mining claims in Death Valley and a 5-ton mill. Turner and his partners were to receive 49 per cent of the stock in the company in exchange for their claims and the mill. The defendant was to receive 51 per cent of the stock of the company for his payment of all expenses in the construction of a road to the claims and for his purchase and assignment to the company of two house trailers, a bulldozer and equipment and machinery to build the road. The road was started in March. In March the company was incorporated in Nevada with a capital stock of 500 shares at $100 par value per share. The mill which the Turner group had contributed was transported by burro into the mountains and left disassembled. In June amended articles of incorporation were filed providing for a capital structure of 50,000 shares at $1.00 par value per share. In that same month the Turner group was issued 12,250 shares of stock and their claims and mill were assigned to the company. At the same time 12,750 shares were issued to the defendant. The defendant finished the construction of the road a short time later, and some work such as building a camp was done. The mill was never assembled. Nothing was done after November, 1952. A bank account of the company, opened in April, 1952, was closed out finally in March, 1953.

A son of the defendant traded to the company some equipment, including a welding outfit, for 2,200 shares of the company's stock. The certificate for this stock was dated September 3, 1952, and was the only stock he ever received.

In November, 1953, the defendant bought for himself a mill and the Arcturus mining claim. This mill was located about eight miles from Baker, California, and was about 75 miles from the mill owned by the company. In December, 1953, the company authorized the purchase of this mill and mine for 100,000 shares of its stock and also resolved that the capital structure of the company be changed to provide for 250,000 shares of $1.00 par value for each share.

The defendant conducted operations at his mill from November, 1953, until the summer of 1954. He returned the Arcturus claim to the former owner, Gaskins, and bought two

other mining claims, the Telegraph and the Telegraph Extension. In exchange for 100,000 shares of stock issued to him in December, 1954, the defendant gave to the company the mill near Baker and the two Telegraph claims in lieu of the Arcturus claim.

Mrs. Madelon Baker traded an automobile for 1,500 shares of the stock of the company in February, 1954. She went to the mill at Baker with Gaskins in January, 1954, and met the defendant who told her that she would be receiving large dividends in about three months. She received the 1,500 shares, which were issued to her directly from the company, for turning her car over to Gaskins. No certificate was ever issued to Gaskins.

Mrs. Baker told McLain about the mine and her investment in the company and he indicated some interest in meeting the defendant and buying some stock. The defendant stopped in McLain's office in February, 1954, and was told by Mrs. Baker that McLain was enthusiastic about the stock. Mrs. Baker introduced the defendant to Mr. McLain. The defendant told McLain that he was in mining activities and that the name of his company was the Death Valley Panamint Mining Company; that the venture was kept very close in the family; that it was a small affair and that no effort was being made to sell any stock outside; that the company had an operating mill just eight miles out of Baker, had a number of very excellent mining claims and that it was a going concern. He further stated that they expected, within a short time, to pay high dividends each month and they needed some capital for salaries at the mill and mine, and for equipment and machinery at the mine, and that was why he, the defendant, wanted to sell some stock. The defendant also stated that the money from the purchase of any stock would go to help expand the operations at the mines, toward corporate purposes, and would be used for payrolls at the mill and mine owned by the company at Baker. McLain asked for a financial statement but never received it.

McLain mailed a check dated February 11, 1954, for $2,000, made payable to the Panamint Mining Company. The check was received and endorsed by the defendant and the money therefrom was deposited in the defendant's bank account in Riverside, California, on February 15, 1954.

McLain mailed another check for $500, made payable to Death Valley Panamint Mining Company, to the company in care of the defendant at Baker. This check was endorsed

by the defendant and the money therefrom was deposited in his account on April 7, 1954.

McLain mailed another check for $500, dated June 14, 1954, made payable to Death Valley Panamint Mining Company. The defendant deposited this check in his account at the bank at Riverside on June 21, 1954.

Mrs. Baker also told Richard Harvuot about the company. He was interested and bought 500 of her 1,500 shares. Mrs. Baker and Harvuot went to Baker in the spring of 1954 and she introduced Harvuot to the defendant. Harvuot wanted to buy some stock but was told by the defendant that there was none for sale.

The defendant gave Mrs. Baker 500 shares of his stock for her services, and to show his gratitude to her for being instrumental in bringing McLain's $3,000 to his aid.

The company issued 500 shares to Harvuot on June 5, 1954. This was done in accordance with an understanding arrived at between Mrs. Baker and the defendant, so that it would not be necessary for her to break up her 1,500 share certificate.

A son of the defendant called Mrs. Baker and told her that a friend of his had some stock and was willing to sell at half price. Mrs. Baker said she couldn't buy it but that she had a friend who could. She called the defendant and talked to him about the conversation she had had with his son. The defendant stated that he was displeased with the boy for wanting to sell at half price, but it was legitimate and if she wanted to buy it he, the defendant, would issue the stock directly to her because the stock had never been issued to the boy, who was supposedly a friend of his son. Mrs. Baker talked to Harvuot and he said he would buy at that price. Mrs. Baker was then told by the son that the boy friend had decided not to sell his stock.

The defendant talked to Mrs. Baker and explained that he was in receipt of some very fine engineering reports about the Telegraph Mine and that he knew McLain and Harvuot would be interested. There was a meeting of Mrs. Baker, Harvuot, McLain and the defendant at Mrs. Baker's home, where the defendant stated that he had purchased the mine for a very good price, that they could go in and haul out the ore and with a mill operating, it was all ready to start moving. The defendant said it was a very fine investment for the company and that he needed capital to develop the mine. He wanted Mrs. Baker and Harvuot to buy more stock. The defendant pointed out to Harvuot that if he bought the stock

which his son's friend had for sale it would only result in the money going into the boy's pocket, whereas if he bought stock from him or the company that the money would go into his original investment and into the development of the Telegraph mine, and therefore be a wise thing to do. Harvuot later talked to the defendant and told defendant he would buy half of the 2,000 shares available at $500, if the defendant could arrange it. The defendant told Harvuot to make his check out to him, and this was done. The check was endorsed by the defendant.

In 1955, McLain made a trip to Baker and was told at the property that the defendant was in Los Angeles. McLain wrote to the defendant and attempted to recover some of his money.

A Los Angeles county investigator assigned to the District Attorney's office attempted to serve a warrant on the defendant at Baker on January 31, 1957. The attempt was unsuccessful and it was learned that the defendant was no longer living there. The defendant was arrested on February 7, 1957, and at that time he stated that he had left Baker in October, 1956, and had been living in Las Vegas since about that time.

None of the money received from Harvuot and McLain ever went to the benefit of the company.

The prior conviction was admitted.

. The defendant contends on appeal:

(1) The evidence was insufficient to show an intent to commit grand theft by false representation;

(2) Defendant could not have been properly convicted on both Count II and Count IV as together they constituted but one offense; and

(3) The statute of limitations had run on any offense covered by Counts II and IV.

Section 484 of the Penal Code provides in part that any person who shall ". . . by any false or fraudulent representation or pretense, defraud any other person of money, . . . is guilty of theft."

▮ This court, speaking through Mr. Presiding Justice White, said in *People* v. *Massey*, 151 Cal.App.2d 623, at pages 658-659 [312 P.2d 365] : "The elements of the crime of grand theft on this theory [fraud committed by false pretenses] of obtaining money or property by false pretenses are: (1) an intent to defraud; (2) an actual fraud committed; (3) the use of false pretenses to perpetrate the fraud; and (4) reliance

upon the fraudulent representations in parting with the money or other property. (Citing cases.)''

■ It is not necessary to recite all of the evidence in this case; suffice it to say that enough already has been set forth herein to show, upon a study thereof, that the defendant was guilty of a fraud and false pretense. The evidence disclosed that the venture was not as described by the defendant in that, among other things, the stock was not closely held and it was not a small family affair. Furthermore, the only mill which the company owned was not even assembled and was some 75 miles from Baker. The defendant himself owned the mill near Baker and was operating it for himself. The company was not a going concern and had been dormant since November, 1952. The money from the sale of the stock was not used for the company, but was used by the defendant for his personal expenses. ■ In *People* v. *Massey, supra,* it was appropriately stated (p. 659): ''What constitutes fraud and false pretense may not be the subject of a definite or invariable rule, but we feel that it may justly be said that included therein are the elements of trick, cunning, dissembling and unfair ways by which another is deceived. Deception deliberately practiced for the purpose of gaining an unfair advantage of another is fraud.''

A complete reading of the transcript discloses that the defendant knew that many of the representations he made were false, and that he intended to and did defraud McLain. As to Harvuot, it is clear that the defendant fabricated testimony about who received the money from Harvuot, thereby showing a consciousness of guilt. ■ And in any event, in the present situation, it was not necessary that the property taken inure to the benefit of the defendant. (*People* v. *Ashley,* 42 Cal.2d 246, 259 [267 P.2d 271]; *People* v. *Rabe,* 202 Cal. 409, 423 [261 P. 303]; *People* v. *Coffelt,* 140 Cal.App. 444, 449 [35 P.2d 374].)

In our opinion the evidence is sufficient to sustain the contentions of the prosecution.

■ As to the defendant's second contention, defendant insists that but one offense occurs where fraudulent representations induce the victim to enter into a contract for the sale of stock which provides for installment payments and where separate payments are made pursuant thereto.

We view the evidence as showing three separate, distinct and different sales of stock, all based upon false representa-

tions made before the first sale, and not as an installment type contract. See *People* v. *Rabe, supra,* 202 Cal. 409, at page 413, and also *People* v. *Ashley, supra,* 42 Cal.2d 246, where it is pointed out at page 273:

"The claim of error is predicated upon the denial of a motion to have the prosecution elect between the two counts charging defendant with grand theft from Mrs. Neal, and between the two counts charging him with grand theft from Mrs. Russ. It is contended that only one theft was committed as to each of the prosecuting witnesses. 'Where the proof in a given case is sufficient to show the existence of a fraudulent intent or purpose on the part of an accused to obtain property from another by false or fraudulent representations, the making of the first false representations which moved or induced the person to whom they were made to part with his property does not immune the defrauding person from punishment for subsequently obtaining from said person other property which was parted with under the influence of the fraudulent representations which were still operating on the mind of the defrauded person at the time he passed his property into the hands of said designing person.' (Citing case.)"

The defendant relies upon *People* v. *Lima,* 127 Cal.App.2d 29 [273 P.2d 268], and *Dawson* v. *Superior Court,* 138 Cal. App.2d 685 [292 P.2d 574] ; but a reading of those cases convinces us that the facts in the instant case and those in the cited cases are very different.

■ As to the defendant's third contention, namely, that the statute of limitations had run as to counts II and IV : even assuming that counts II and IV are but part of one offense (and not separate offenses, as we believe them to be), the statute of limitations had not, in our opinion, run.

Section 800 of the Penal Code reads in part as follows :

"An indictment for any other felony than murder, the embezzlement of public money, the acceptance of a bribe by a public official or a public employee, or the falsification of public records, must be found, and information filed, or case certified to the superior court, within three years after its commission. . . ."

It was proved and established that the defendant was absent from the state of California for a period of time, and the statute was tolled during such period. The information was filed three years and eight days after the first payment, and

the statute was tolled for about three months, consequently it is clear that the prosecution was not barred.

The order granting probation is affirmed.

White, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 4, 1959.